T.C. Memo. 1998-315

UNITED STATES TAX COURT

LEONARD PIPELINE CONTRACTORS, LTD., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 28985-91.                    Filed September 1, 1998.

<u>Marc L. Spitzer</u> and <u>James P. Powers</u>, for petitioner.

<u>Susan E. Seabrook</u>, for respondent.


SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  This case is before us on remand from the
Court of Appeals for the Ninth Circuit.  <u>Leonard Pipeline</u>

_____

[*]    This opinion supplements our Memorandum Findings of
Fact and Opinion in <u>Leonard Pipeline Contractors, Ltd. v.
Commissioner</u>, T.C. Memo. 1996-316, revd. and remanded 142 F.3d
1133 (9th Cir. 1998).

Contractors, Ltd. v. Commissioner, 142 F.3d 1133 (9th Cir. 1998), revg. and remanding T.C. Memo. 1996-316.

The issue for decision concerns the reasonableness of the amount of compensation paid by petitioner to its president, Richard L. Leonard, in 1987. We previously determined in Leonard Pipeline Contractors, Ltd. v. Commissioner, T.C. Memo. 1996-316 (Leonard Pipeline I), that of the $1,777,800 petitioner paid Mr. Leonard in 1987, only $700,000 was reasonable and thus deductible as a section 162 business expense.[1] The Court of Appeals has directed us to explain how we arrived at our conclusion that $700,000 represented a reasonable amount of compensation. The Court of Appeals has further directed us to consider that the burden of proof is on petitioner, and to

> determine what, if any, factors, have been demonstrated so as to require a setting aside of the Commissioner's determination, the recognition of a right to increased compensation, and the establishment of an amount qualifying as reasonable under § 162(a)(1).

142 F.3d at 1136.

## FINDINGS OF FACT

The findings of fact are set forth in Leonard Pipeline I and are incorporated herein by this reference. For convenience, we shall repeat those facts as necessary to clarify the ensuing

---

[1] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

discussion. The stipulation and exhibits are also incorporated herein by this reference.

Leonard Pipeline Contractors, Ltd., petitioned this Court contesting respondent's determination of an $807,983 deficiency in its Federal income tax for its taxable year ended September 30, 1987, and additions to tax pursuant to section 6653(a)(1)(A) in the amount of $40,399 and section 6653(a)(1)(B) in the amount of 50 percent of the interest on $807,983. The deficiency was based on respondent's determination that $1,642,593 of the $1,777,800 petitioner deducted as compensation paid to Richard L. Leonard was unreasonable. Respondent subsequently conceded the additions to tax.

At the time petitioner Leonard Pipeline Contractors, Ltd., filed its petition herein, its principal place of business was in Scottsdale, Arizona. Petitioner filed the relevant Federal income tax return based on a fiscal year ended September 30, 1987. (All references hereinafter to petitioner's relevant years refer to petitioner's fiscal years ended September 30.)

Richard L. Leonard had extensive experience in the pipeline industry, dating from the 1950's. In 1977, he caused petitioner to be established in Canada and became its president and chief financial and operating officer. At all relevant times, petitioner's stock was wholly owned by R.L. Leonard Holdings, Ltd. (RLLH), whose stock in turn was wholly owned by Mr. Leonard. Petitioner became a U.S. corporation on April 18, 1985.

Between 1978 and 1987, petitioner had gross revenues of $123,124,905 and after-tax net income of $1,705,958. Petitioner's primary source of income in 1985 and 1986 arose from its work on the All American Pipeline project,[2] which involved coating, insulating, and wrapping 325 miles of pipeline in Texas, Arizona, and California. In connection with this project, Mr. Leonard personally guaranteed petitioner's $1.5 million debt to the Royal Bank of Canada. The All American Pipeline project was finished in 1987; thereafter petitioner continued to receive payments on the contract but undertook no new business.

In February 1987, Mr. Leonard began contemplating retirement. On September 28, 1987, 2 days before the end of petitioner's tax year, petitioner's board of directors (consisting of Mr. Leonard and his son) voted to pay Mr. Leonard a $1.68 million bonus in addition to his $97,800 salary for the year. The board's decision was purportedly based on several considerations, including: (1) Mr. Leonard's efforts in obtaining the All American Pipeline project; (2) Mr. Leonard's development of a new insulation process; and (3)

---

[2] On Sept. 19, 1991, Mr. Leonard ultimately pled guilty to a criminal information filed against him in the District Court for the Southern District of Texas for obtaining the All American Pipeline contract through fraud. He was sentenced to 3 years of unsupervised probation and fined $1,000.

the fact that petitioner did not pay Mr. Leonard any compensation in 1985 or 1986.[3]

_____

[3] The minutes of the board meeting stated, in pertinent part:

1. The President, through his efforts as early as 1984 and resultant personal and business contacts acquired from those efforts, was able to have the corporation placed on the bidding list for All American Pipeline Company.

2. The President[,] having acquired expertise in the coating and insulation of pipe in Saudi Arabia during 1978 through to 1980[,] was able to develop a new insulation process starting in 1984, which process was ultimately successful in securing the All American contract (the "contract").

3. The corporation, notwithstanding the successful insulating process, would have been unable to complete the contract without the financial backing of a public corporation or a joint venture partner with financial backing. The President, through his thirty years association with the President of the Permanent Concrete Ltd., was able to secure a financially strong joint venture partner for the corporation, which partner secured for the joint venture Five Million Dollars ($5,000,000) of financing and obtained approximately Twenty-Three Million Dollars ($23,000,000) of bonding. This was accomplished without giving up more than fifty percent of the participation which would have otherwise been the case.

4. The President personally guaranteed the corporation's share of the bank financing and indemnified the joint venture partner, Anchor Wate, a subsidiary of Permanent Concrete Ltd., in respect of the bonding and further pledged his assets in support of the guarantee.

5. The President has received no compensation from the corporation for 1985 and 1986. In addition, the corporation was unable to pay compensation to its President in those years due to Royal Bank of Canada credit line restrictions, which credit line was also

(continued...)

On its 1987 fiscal year return, petitioner deducted the amount of salary and bonus ($1,777,800) it paid Mr. Leonard.

In 1985, Mr. Leonard and his wife initiated divorce proceedings, and in 1987, they divorced. Pursuant to their property settlement, Mr. Leonard provided his former wife money and property valued at $1.68 million.

## OPINION

The U.S. Court of Appeals for the Ninth Circuit has directed us to further explain the method we employed to arrive at $700,000 as reasonable compensation for Mr. Leonard in 1987. Leonard Pipeline Contractors, Ltd. v. Commissioner, 142 F.3d at 1136. With the discussion that follows, we attempt to provide the Court of Appeals with "a trail" to follow as to how we reached our prior conclusion. See Akers v. Commissioner, 798 F.2d 894, 897 (6th Cir. 1986), revg. and remanding T.C. Memo. 1984-208; Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987); Symington v. Commissioner, 87 T.C. 892, 904 (1986).

---

[3](...continued)
personally guaranteed by him. Not until now, with the contract completed and the benefits from subsequent grading and fencing contracts awarded being realized, is the corporation in a position to adequately compensate its President for his unique and extremely profitable contribution to the corporation.

<u>Burden of Proof</u>

"The burden of proof remains on the Taxpayer to show that the Commissioner's determination was wrong." <u>Leonard Pipeline Contractors, Ltd. v. Commissioner</u>, 142 F.3d at 1136. "This burden is a burden of persuasion; it requires * * * [petitioner] to show the merits of [its] claim by at least a preponderance of the evidence." <u>Rockwell v. Commissioner</u>, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133. Where the Commissioner has made a deficiency determination denying the taxpayer's entitlement to a claimed deduction (such as here), "the taxpayer has 'the burden of producing enough evidence to rebut the deficiency determination and the burden of persuasion in substantiating a claimed deduction'." <u>Goldberg v. United States</u>, 789 F.2d 1341, 1343 (9th Cir. 1986) (quoting <u>Valley Title Co. v. Commissioner</u>, 559 F.2d 1139, 1141 (9th Cir. 1977), revg. and remanding T.C. Memo. 1975-48).

In the instant case, petitioner produced sufficient evidence to overcome the presumption of correctness of respondent's determination. We were convinced that petitioner was entitled to a greater compensation deduction than that allowed by respondent. Ample evidence demonstrated the magnitude of Mr. Leonard's contributions to petitioner: (1) Mr. Leonard was directly responsible for petitioner's growth and success--providing invaluable services to the company by obtaining contracts and generating business for petitioner; (2) over its 10 years of existence, petitioner had total gross revenues of $123,124,905 and

after-tax net income of $1,705,958, which was all attributable to Mr. Leonard's efforts; (3) the board of directors minutes supported the notion that in paying Mr. Leonard in 1987, petitioner was attempting in part to compensate him for services performed in 1985 and 1986; and (4) petitioner never provided Mr. Leonard with retirement benefits, which an individual in his position justly deserved. These four factors led us to the conclusion that we must set aside respondent's determination in the notice of deficiency. Because, in our opinion, petitioner had proven respondent's determination incorrect, we were forced to decide the proper amount of reasonable compensation on the basis of the entire record before us. See Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975).

Section 162(a)(1) Deduction

Section 162(a)(1) permits a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense. Compensation payments are deductible under section 162(a)(1) if they are reasonable and paid "purely for services" rendered to the business. Sec. 1.162-7(a), Income Tax Regs. Bonuses paid to employees are deductible only when made in good faith and as additional compensation for services actually rendered by the employees, provided that when added to the salaries, they do not exceed reasonable compensation for the services rendered. RAPCO, Inc. v. Commissioner, T.C. Memo. 1995-

128, affd. 85 F.3d 950 (2d Cir. 1996); sec. 1.162-9, Income Tax Regs.  Courts generally focus on the reasonableness requirement. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.  "The inquiry into reasonableness is a broad one and generally subsumes the inquiry into compensatory intent."  Summit Publg. Co. v. Commissioner, T.C. Memo. 1990-288.

Five-Factor Test

The U.S. Court of Appeals for the Ninth Circuit uses a five-factor test, as enumerated in Elliotts, Inc. v. Commissioner, supra at 1245-1248, to determine reasonableness of compensation:  (1) The employee's role in the company; (2) a comparison of the compensation paid to the employee with the compensation paid to similarly situated employees in similar companies; (3) the character and condition of the company; (4) whether a conflict of interest exists that might permit the company to disguise dividend payments as deductible compensation; and (5) whether the compensation was paid pursuant to a structured, formal, and consistently applied program.  No single factor is dispositive. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7.

A detailed discussion of these factors is set forth in Leonard Pipeline I.  We will briefly summarize herein our findings with respect to each factor, and, where appropriate, provide some elaboration.

First, there was little doubt that Mr. Leonard was essential to petitioner's success from its inception and indispensable to petitioner's business. Moreover, he personally guaranteed petitioner's $1.5 million debt to the Royal Bank of Canada, which was crucial to the All American Pipeline project. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1325 n.33 (5th Cir. 1987), affg. T.C. Memo. 1985-267. Although during 1987 Mr. Leonard was in the process of retiring and petitioner's only activity was to report previously earned income, these facts were inconsequential in light of Mr. Leonard's experience and past services.

Second, both parties relied upon expert testimony and written opinions for purposes of determining external comparison. The range of figures offered by these experts was unreasonably disparate. Respondent's expert, Emmett James Brennan III, determined the highest average amount of total compensation for Mr. Leonard for 1987 to be $160,710. He also determined that in the event we concluded that Mr. Leonard was entitled to a retirement benefit, an additional $167,450 should be allocated for that benefit. One of petitioner's experts, Michael Wagner, offered a $180,000 to $200,000 range for Mr. Leonard's 1987 base salary and a $1.2 million to $2 million range for Mr. Leonard's 1987 bonus. Petitioner's other expert, Michael Kesner, concluded that the total amount of compensation petitioner paid Mr. Leonard in 1987 was reasonable because, according to Mr. Kesner, among other reasons,

Mr. Leonard was undercompensated by $2,050,000 to $2,700,000 in prior years.  Mr. Kesner suggested an additional $296,000 should have been paid to Mr. Leonard as retirement benefits.

We evaluate the opinions of experts in light of their demonstrated qualifications and when considered with the other evidence in the record.  Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178.  We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1983-200), affg. in part and revg. in part T.C. Memo. 1986-318.  We may accept or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion which we decide to adopt.  Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986); Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.

Here, the experts reached conclusions which patently favored their respective clients, and their reports were designed to support their conclusions.  Previously, we have observed that experts may lose their usefulness and credibility when they merely become advocates for one side.  See, e.g., Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980).  We have not hesitated to reject expert testimony when we find that the

methods presented by the experts constitute advocacy.  Laureys v. Commissioner, 92 T.C. 101, 127-129 (1989); see also Estate of Halas v. Commissioner, 94 T.C. 570, 578 (1990).

With regard to the instant case, in some instances, petitioner's experts were nothing more than advocates for their client and in those instances, we dismissed their conclusions; however, in other instances, we found the experts' testimony credible and thus accepted that part, as discussed infra.

Our disagreement with the analyses performed by petitioner's experts was limited to their determination of exaggerated figures-- Mr. Wagner advocated a bonus in the $1.2 million to $2 million range, and Mr. Kesner believed Mr. Leonard was undercompensated by $2,050,000 to $2,700,000. With regard to the opinion of Mr. Brennan, respondent's expert, we rejected it because Mr. Brennan relied upon information from businesses different than petitioner's in reaching a result that understated reasonable compensation.

Notwithstanding the aforesaid, given the relative proximity of the figures between petitioner's and respondent's experts with respect to the base salary and retirement components, we found both Mr. Wagner's base salary figures ($180,000 to $200,000) and Mr. Kesner's retirement figure ($296,000) to be reasonable, as discussed infra.

Third, Mr. Leonard's new insulation process promoted petitioner's business.  Also, the ratio of Mr. Leonard's bonus to petitioner's taxable income before the compensation deduction was

34 percent ($1,680,000 divided by $4,922,631), which was appropriate in light of Mr. Leonard's work history and undercompensation in 1985 and 1986. However, during the year in issue, Mr. Leonard was attempting to wind down the business.

Fourth, because Mr. Leonard indirectly owned all of petitioner's stock, a potential for conflict of interest clearly existed. Thus, we carefully scrutinized the reasonableness of the compensation paid to him. See <u>Owensby & Kritikos, Inc. v. Commissioner</u>, <u>supra</u> at 1322-1324; see also <u>Nor-Cal Adjusters v. Commissioner</u>, 503 F.2d 359, 361 (9th Cir. 1974), affg. T.C. Memo. 1971-200. Mr. Leonard's compensation was bonus-heavy and salary-light, which could have suggested masked dividends. See <u>RAPCO, Inc. v. Commissioner</u>, 85 F.3d at 955. Although petitioner paid dividends to RLLH[4] in prior years, it did not pay any dividends in 1987. But petitioner's rate of return for 1987 (175 percent) would have satisfied a hypothetical investor.

Fifth, petitioner did not determine Mr. Leonard's bonus on the basis of any consistently applied formula or plan. The amount of

---

[4] Petitioner paid RLLH a Can$743,828 dividend in 1983, and an Can$878,787 dividend in January 1985 out of petitioner's capital account. Under Canadian law at the time, when a dividend was paid out of a capital account, the distribution was not taxable because it represented the nontaxable portion of capital gain.

William T. Perks, a Canadian chartered accountant and attorney, advised petitioner and Mr. Leonard with regard to tax and legal matters. Before Apr. 18, 1985 (when petitioner became a U.S. corporation), it appears that it was financially advantageous for petitioner to declare dividends under Canadian law.

Mr. Leonard's bonus was not set according to any business considerations; rather, it was meant to recoup from petitioner an amount equal to the amount of money and property awarded to his estranged wife in their divorce ($1.68 million). Indeed, petitioner paid Mr. Leonard's wife $3,000 a month beginning at least in February 1986 as part of Mr. Leonard's support obligation during the pendency of their marriage dissolution action. Interestingly, because Mrs. Leonard did not work for petitioner, the amount paid to her would not have been deductible by petitioner and would have been taxable to Mr. Leonard as a constructive dividend.

Raising a salary (or in this case setting a bonus) towards the end of the year has been held to be an indication that the salary, or bonus, is really a distribution of earnings rather than additional compensation. See, e.g., <u>Rich Plan, Inc. v. Commissioner</u>, T.C. Memo. 1978-514. This is particularly true where no dividends have been paid. We believed that because the board (consisting of Mr. Leonard and his son) passed the resolution 2 days before the end of petitioner's fiscal year, and shortly before Mr. Leonard's retirement, petitioner, to a certain extent, made a deliberate effort to distribute its earnings to Mr. Leonard. On the other hand, petitioner's 1987 compensation to Mr. Leonard did partially represent an attempt to rectify his 1985 and 1986 undercompensation.

Amount of Reasonable Compensation

After considering and weighing the five Elliotts factors, we were faced with a most difficult dilemma because no clear-cut "answer" was apparent. Although petitioner proved respondent's determination to be too low, petitioner did not show the totality of the amount paid to Mr. Leonard to be reasonable. Accordingly, we were forced to decide for ourselves an amount which constituted a reasonable compensation figure on the basis of the record before us. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6. And in this regard, we agree with the Court of Appeals for the Ninth Circuit's observation that determining "reasonableness" of compensation depends "to a degree on the eye of the beholder." Leonard Pipeline Contractors, Ltd. v. Commissioner, 142 F.3d at 1135. Any attempt to determine reasonable compensation with mathematical precision is impossible, see, e.g., Jones Bros. Bakery, Inc. v. United States, 188 Ct. Cl. 226, 245, 411 F.2d 1282, 1294 (1969), and petitioner's experts testified as to this difficulty.[5]

On the basis of all of the evidence before us, we were convinced, and we remain convinced, that the $1,777,800 petitioner paid Mr. Leonard in 1987 was unreasonable. In our opinion, the

---

[5] Mr. Wagner admitted that "bonus awards, in my experience, have been subjective", and Mr. Kesner testified that "This is not--and I repeat not--an exercise in mathematics. It is an exercise in judgment."

amount petitioner paid to Mr. Leonard in 1987 was chosen to a large extent on the basis of the amount Mr. Leonard paid his wife in connection with their divorce settlement. Moreover, it is clear to us that, to a certain extent, the board of directors made a deliberate effort to distribute petitioner's earnings to Mr. Leonard by paying him the $1.68 million bonus 2 days before the end of petitioner's tax year. That being said, however, we believed, and we still believe, that a portion of the $1.68 million bonus petitioner paid Mr. Leonard was intended to compensate him for past and other valuable services he rendered to petitioner, and in that regard that portion constituted reasonable compensation.

We concluded that $700,000 represented a reasonable amount of total compensation for Mr. Leonard for 1987. This amount comprised $200,000 as a salary, $195,000 as a bonus, and $296,000 as a lump-sum retirement payment.[6] See Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. at 568. We rounded the $395,000 salary and bonus to $400,000, and the $296,000 retirement figure to $300,000.

We determined the reasonableness of $395,000 (rounded to $400,000) as a salary and bonus on the basis of the following considerations: (1) All of the experts herein agreed that Mr.

---

[6] In the context of valuations, we have determined that the figure arrived at need not be one as to which there is specific testimony if the amount is within the range of values that may properly be arrived at giving consideration to all the evidence. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Leonard was undercompensated during prior years; (2) Mr. Leonard received no prior reward for his personal efforts in obtaining the All American Pipeline contract; and (3) Mr. Leonard received no prior reward for development of the new insulation process.

Both petitioner's and respondent's experts agreed that Mr. Leonard was undercompensated in 1985 and 1986. Yet, despite that conclusion, respondent's expert, Mr. Brennan, made no adjustments to Mr. Leonard's 1987 base salary figure. Rather, Mr. Brennan opined that Mr. Leonard was entitled to $160,710 in 1987, even though he received only $162,252 in 1985 and $142,748 in 1986 from joint ventures involving petitioner. Thus, Mr. Brennan's 1987 figure failed to reflect the fact that Mr. Leonard was entitled to a greater base salary.

Petitioner's expert Mr. Wagner adjusted his 1987 base salary upward to a $180,000 to $200,000 range to reflect the fact that Mr. Leonard was entitled to a greater base salary than he had previously received. We believed an adjustment for the 1987 base salary to $200,000 was appropriate and reasonable. Further, we believed Mr. Leonard should have been given credit for the difference between the amount of his 1985 and 1986 base salaries and $200,000, reflecting Mr. Leonard's undercompensation for those years. (The 1985 and 1986 base salaries were short by $37,748 ($200,000 - $162,252) and $57,252 ($200,000 - $142,748), respectively.) Thus, Mr. Leonard was entitled to $95,000 to reflect his undercompensation for 1985 and 1986. Finally, we

believed a $100,000 bonus was appropriate and reasonable to reflect Mr. Leonard's personal efforts at securing the All American Pipeline contract and guaranteeing the loan to the Royal Bank of Canada, as well as his development of the pipeline insulation process. Therefore, we concluded that $395,000 ($200,000 + $95,000 + $100,000) represented an appropriate total amount for Mr. Leonard's salary and bonus for 1987, and as stated, rounded this amount to $400,000.

We also concluded that $296,000 paid to Mr. Leonard was appropriate and, after rounding to $300,000, represented reasonable compensation as a lump-sum retirement payment. We reached this conclusion on the basis of the fact that petitioner did not offer Mr. Leonard any retirement or pension benefits, a feature common, if not expected, for someone of Mr. Leonard's position with petitioner. High compensation is reasonable when there is a corresponding lack of fringe benefits such as pension plans or stock options which might normally be expected. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407.

Both parties' experts provided figures for retirement benefits. Petitioner's expert Mr. Kesner believed that Mr. Leonard was entitled to a lump-sum payment for retirement benefits of $296,000. Respondent's expert, Mr. Brennan, stated that in the event the Court determined that Mr. Leonard is entitled to a retirement benefit, he would allocate $167,450 for that benefit.

We found Mr. Kesner's figure more reasonable than Mr. Brennan's figure. Mr. Leonard dedicated much of the latter part of his career to petitioner's success, often with little or no direct compensation or security for his future. Mr. Brennan's retirement figure would not have even represented 1 year's salary (under our analysis).

We therefore concluded, and still conclude, that $700,000 represented a reasonable amount of total compensation (salary, bonus, and retirement benefits) for Mr. Leonard in 1987.

<u>Decision will be entered as previously entered on February 7, 1997</u>.