T.C. Memo. 2016-95

UNITED STATES TAX COURT

H. W. JOHNSON, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3110-07.                      Filed May 11, 2016.

Gregory A. Robinson, for petitioner.

John W. Duncan, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined deficiencies in petitioner's Federal

income tax for the taxable years ended June 30, 2003 and 2004 (years at issue),[1] of

$877,440 and $2,087,678, respectively.  The issues for decision are:  (1) whether

---

[1]Unless otherwise indicated, references to a year are to the fiscal year
ending in that calendar year.

[*2] the amounts paid to Bruce A. Johnson and Donald J. Johnson during the years at issue constituted reasonable compensation deductible under section 162;[2] and (2) whether petitioner is entitled to deduct a $500,000 payment to DBJ Enterprises, LLC, an entity controlled by Bruce and Donald, as an ordinary and necessary business expense under section 162 for 2004.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the accompanying exhibits. Petitioner maintained its principal office in Arizona at the time the petition was filed.

I.    Petitioner's inception, management, and organization

During the years at issue petitioner operated a concrete contracting business. At that time petitioner was one of the largest curb, gutter, and sidewalk contractors in the State of Arizona, with over 200 employees and contract revenues of $23,754,182 and $38,022,612 in 2003 and 2004, respectively.

Petitioner was incorporated in 1974 by H.W. Johnson and Margaret Johnson. H.W. and Margaret had operated a predecessor sole proprietorship out

---

[2]All section references are to the Internal Revenue Code of 1986, as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[*3] of their home since 1968. H.W. handled petitioner's operations, and Margaret handled financial and administrative matters.

Two of H.W. and Margaret's sons, Bruce and Donald, began working part time for petitioner as teenagers in the 1970s, and then full time when they completed their education in 1977 and 1982, respectively. Bruce and Donald gradually assumed increasing responsibilities and took over petitioner's daily operations in 1993. H.W. and Margaret made gifts of shares of petitioner's stock to Bruce and Donald; and by 1996, when H.W. retired from petitioner, Bruce and Donald had each acquired 24.5% of the shares, with Margaret retaining the remaining 51%. Upon H.W.'s retirement the brothers became co-vice presidents and members of petitioner's board of directors, along with Margaret.

II. Petitioner's growth and financial condition under Bruce and Donald's management

Petitioner's contract revenues grew rapidly after Bruce and Donald assumed control of petitioner's daily operations in 1993. In that year petitioner had contract revenues of approximately $4 million; contract revenues increased to over $11 million and $13 million in 1994 and 1995, respectively. Petitioner's contract revenues remained steady at about $17 million between 1996 and 1999 and

[*4] climbed steadily every year thereafter including the years at issue, when revenues increased dramatically between 2003 and 2004.

Petitioner was profitable and experienced significant revenue and asset growth during 2003 and 2004, with gross profit margins before payment of officer bonuses of 38.3% and 38.2%, respectively. Petitioner's assets, liabilities, equity, revenue, net income before taxes, and net income after taxes during 2002 through 2004 were as follows:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Assets | $6,814,399 | $8,844,769 | $13,424,705 |
| Liabilities | 3,228,649 | 5,058,551 | 9,536,121 |
| Equity | 3,585,750 | 3,786,218 | 3,888,584 |
| Contract revenue | 23,239,207 | 23,754,182 | 38,022,612 |
| Net income before taxes | 210,967 | 387,706 | 348,579 |
| Net income after taxes | 132,545 | 250,468 | 202,366 |

During the years at issue Bruce and Donald personally guaranteed loans whose proceeds petitioner used to purchase materials and supplies.

[*5] III.    Petitioner's operations and industry reputation in 2003 and 2004

During the years at issue Margaret served as petitioner's president and chairman of the board. She handled the company's payroll and finances, accounts receivable and delinquent account collections, employee hiring and terminations, and various other administrative functions, working around 40 hours a week. Bruce and Donald together managed all operational aspects of petitioner's business. Operations were split into two geographical divisions, eastern and western, with each brother managing a division's operations, including contract bidding and negotiation, project scheduling and management, equipment purchase and modification, personnel management, and customer relations. Bruce and Donald each supervised over 100 employees in their respective divisions, including superintendents and foremen, and worked 10 to 12 hours a day, five to six days a week. They were at the jobsites daily and regularly operated equipment while there. The brothers were readily available if problems at a jobsite arose and were known in the local industry for their responsive and hands-on management style.

Approximately 95% of petitioner's business during the years at issue was for residential subdivision construction. The concrete work Bruce and Donald supervised required considerable technical skill and coordination, as fresh

**[\*6]** concrete is highly perishable. Concrete "sets"--and becomes unusable--either 90 minutes after it is mixed and loaded onto a truck or if it reaches 90 degrees. (Keeping the concrete from reaching 90 degrees in Phoenix's typical 100-degree-plus temperatures was a particular challenge in petitioner's operations.) The concrete for sidewalks and curbs had to be poured precisely to prevent surface areas where water could collect; if water stood more than half an inch deep at any point on a finished curb or sidewalk, the area had to be ripped out and repoured or ground down to correct the flaw. Additionally, petitioner had to meet the varying specifications of different contractors, engineers, cities, towns, and counties on any given job. Petitioner's equipment was often modified or specially fabricated to meet the requirements of a given job. Most such work was done in-house--thereby reducing costs and improving efficiency--with Bruce or Donald often supplying the idea for a design that was then refined and implemented by petitioner's fabrication foreman.

Petitioner had an excellent reputation with developers, inspectors, and other contractors and was known for its timely performance and quality product. As a result, petitioner was routinely awarded contracts even where it was not the lowest bidder, and the company needed little marketing beyond its reputation in the industry.

**[*7]** IV. <u>Cement shortage and formation of Arizona Materials</u>

A reliable supply of concrete was critical to petitioner's business. Petitioner, however, did not produce its own concrete, relying instead on local suppliers. Starting in late 2002 and throughout the years at issue there were shortages of concrete in petitioner's market due to a housing boom in Arizona. In addition, large multinational and national firms were acquiring suppliers of concrete in Arizona, disrupting petitioner's theretofore locally based network. Faced with the possibility of disruptions in petitioner's supply of concrete, Bruce and Donald suggested to Margaret that petitioner invest in a concrete supplier so as to have a reliable supply. Margaret, holding a controlling share in petitioner, refused to involve the company in such a venture because she judged it too risky.

On March 21, 2003, Bruce and Donald, acting through D.B.J. Enterprises, LLC (DBJ),[3] partnered with other investors, including a former executive of a local concrete supplier that had been acquired by a large multinational firm, to form Arizona Materials, LLC (Arizona Materials), to conduct a concrete supply business. DBJ owned a 52% interest in Arizona Materials. Bruce and Donald,

---

[3]Bruce and Donald had formed DBJ on August 10, 1995, to hold investments; during the years at issue Bruce and Donald each owned 50% of DBJ through family trusts.

[*8] through DBJ, invested substantial sums in, and guaranteed the indebtedness of, Arizona Materials.

There were also occasional market shortages of cement--an essential ingredient of concrete--during the years at issue, but Arizona Materials was able to obtain access to cement over that period because of the relationships its other investors had with cement suppliers. Though sometimes unable to procure concrete from its other suppliers, petitioner obtained a substantial amount of concrete from Arizona Materials during 2004 and was able to procure concrete even when other contractors could not (and were therefore forced to temporarily suspend operations). Petitioner received bulk discounts for large concrete purchases from Arizona Materials, obtaining concrete at a price lower than it paid other suppliers. DBJ exercised its influence as majority shareholder of Arizona Materials to ensure that petitioner received a steady supply of concrete, as at that time Arizona Materials had other customers willing to pay a higher price for the concrete.

At the end of 2004 petitioner paid DBJ $500,000. Petitioner's board meeting minutes state that the payment was for a "guaranteed supply of concrete at market prices for the year ended June 30, 2004. DBJ Enterprises, L.L.C. has negotiated with Arizona Materials L.L.C. on behalf of H.W. Johnson, Inc. to

**[*9]** provide a continuous supply of concrete." Petitioner and DBJ had no written agreement regarding the $500,000 payment.

## V.     Petitioner's officer compensation and dividend plans

During the years at issue petitioner's board held annual meetings in May to determine officer compensation, director's fees, and dividends. Petitioner compensated Bruce and Donald as follows:[4]

| Officer | 2003 | 2004 |
|---------|------|------|
| Bruce | $2,013,250 | $3,651,177 |
| Donald | 2,011,789 | 3,649,739 |
| Total | 4,025,039 | 7,300,916 |

Under petitioner's officer bonus formula, adopted by petitioner's board in 1991 and amended in 1999, total potential bonuses were calculated in proportion to the company's annual contract revenue and added to a "bonus pool". The bonus pool was calculated under the 1991 bonus formula as follows: 12% of contract revenue up to $10 million; 10% of contract revenue between $10 million and $20 million; and 8% of contract revenue in excess of $20 million. The bonus pool was calculated under the amended 1999 bonus formula as follows: 20% of contract revenue up to $15 million; 18% of contract revenue between $15 million and $30

---

[4]These amounts include officer salaries, bonuses, and director's fees.

[*10] million; and 16% of contract revenue between $30 million and $45 million. At yearend and upon the advice of petitioner's accountant, the board of directors issued bonuses out of the bonus pool based on officer performance and petitioner's ability to pay. Any unpaid amounts remained in the bonus pool for later payment pending board approval. Petitioner's board awarded bonuses between 1992 and 2004 as follows:

| Year | Contract revenue | Bonus pool | Bonuses awarded[1] | | Amount overpaid or (underpaid) from current bonus pool |
|------|------------------|------------|-----------------|---|-----------------------------------------------|
| 1992 | $2,637,877 | Accumulated: n/a<br>Current: $316,545 | M:<br>B:<br>D:<br>Total: | $20,000<br>50,000<br>50,000<br>120,000 | ($196,545) |
| 1993 | 3,924,803 | Accumulated: 196,545<br>Current: 470,976 | -0- | | (470,976) |
| 1994 | 11,148,877 | Accumulated: 667,521<br>Current: 1,314,888 | -0- | | (1,314,888) |
| 1995 | 13,050,253 | Accumulated: 1,982,409<br>Current: 1,505,025 | -0- | | (1,505,025) |
| 1996 | 17,297,573 | Accumulated: 3,487,434<br>Current: 1,929,757 | M:<br>B:<br>D:<br>Total: | 833,000<br>833,000<br>833,000<br>2,499,000 | 569,243 |
| 1997 | 16,430,480 | Accumulated: 2,918,191<br>Current: 1,843,048 | M:<br>B:<br>D:<br>Total: | 833,333<br>833,333<br>833,333<br>2,499,000 | 656,951 |
| 1998 | 18,112,935 | Accumulated: 2,261,240<br>Current: 2,011,294 | M:<br>B:<br>D:<br>Total: | 650,000<br>775,000<br>775,000<br>2,200,000 | 188,706 |

**[*11]**

| Year | | | | | |
|---|---|---|---|---|---|
| 1999 | 17,924,893 | Accumulated: 2,072,534<br>Current: 3,529,721 | M:<br>B:<br>D:<br>Total: | 250,000<br>875,000<br>875,000<br>2,000,000 | (1,529,721) |
| 2000 | 19,409,457 | Accumulated: 3,602,255<br>Current: 3,793,702 | M:<br>B:<br>D:<br>Total: | 250,000<br>1,250,000<br>1,250,000<br>2,750,000 | (1,043,702) |
| 2001 | 20,062,213 | Accumulated: 4,645,957<br>Current: 3,911,198 | M:<br>B:<br>D:<br>Total: | 250,000<br>1,550,000<br>1,550,000<br>3,350,000 | (561,198) |
| 2002 | 23,239,207 | Accumulated: 5,207,155<br>Current: 4,483,057 | M:<br>B:<br>D:<br>Total: | 250,000<br>1,750,000<br>1,750,000<br>3,750,000 | (733,057) |
| 2003 | 23,754,182 | Accumulated: 5,940,212<br>Current: 4,575,753 | M:<br>B:<br>D:<br>Total: | 250,000<br>1,750,000<br>1,750,000<br>3,750,000 | (825,753) |
| 2004 | 38,022,612 | Accumulated: 6,765,965<br>Current: 6,983,618 | M:<br>B:<br>D:<br>Total: | 500,000<br>3,400,000<br>3,400,000<br>7,300,000 | 316,382 |

[1]M = Margaret; B = Bruce; D = Donald

During the years at issue petitioner also had a dividend plan, adopted in 1991 and amended in 1999. That plan called for dividend payments when the company's retained earnings exceeded $2 million. The board determined the amount of the dividend on the basis of petitioner's financial position, profitability, and capitalization, following the advice of petitioner's accountant. Petitioner paid modest annual dividends to its shareholders between 1996 and 2004. For most of

[*12] those years, the dividend amount was $25,000. In 2002 and 2003 the amount rose to $50,000, and in 2004, it was $100,000.

VI.    Petitioner's 2003 and 2004 returns and the deficiency determinations

On its timely filed Forms 1120, U.S. Corporation Income Tax Return, for 2003 and 2004 petitioner claimed deductions for the salaries, bonuses, and director's fees it paid to Margaret, Bruce, and Donald. Petitioner also claimed a deduction for 2004 for the $500,000 it paid to DBJ, reporting the payment as an "administration fees" expense.

Respondent issued a notice of deficiency to petitioner determining that $2,607,517 and $5,616,771 of the amounts petitioner deducted for 2003 and 2004, respectively, as officer compensation exceeded reasonable compensation and disallowing in its entirety the $500,000 deduction petitioner claimed for 2004 as administration fees. Petitioner timely petitioned this Court for redetermination of the deficiencies.

OPINION

I.    Reasonable compensation

Petitioner contends that the $4,025,039 and $7,300,916 it paid to Bruce and Donald and deducted as compensation for 2003 and 2004, respectively, constitute reasonable compensation under section 162(a)(1). Respondent disagrees. The

[*13] notice of deficiency disallowed $2,607,517 and $5,589,074[5] of the claimed

deductions for 2003 and 2004, respectively, as exceeding reasonable

compensation, treating the reasonable amounts as limited to $1,417,522 and

$1,711,842, respectively, for each year.  Respondent now concedes that

deductions of $3,214,000 and $6,532,000 for compensation are reasonable,

leaving $811,039 and $768,916 in dispute for 2003 and 2004, respectively.

Section 162(a)(1) permits a taxpayer to deduct "a reasonable allowance for

salaries or other compensation for personal services actually rendered" as an

ordinary and necessary business expense.  A taxpayer is entitled to a deduction for

compensation payments if the payments are reasonable in amount and in fact paid

purely for services.  Sec. 1.162-7(a), Income Tax Regs.  Though framed as a two-

pronged test, courts considering the deductibility of compensation under section

162(a)(1) generally focus on whether the amount of purported compensation is

reasonable.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1244 (9th Cir. 1983),

rev'g T.C. Memo. 1980-282.  Petitioner has the burden of proving that the

---

[5]The notice of deficiency also initially disallowed $27,697 of director's fees petitioner paid to Margaret and deducted for 2004.  Respondent has not addressed Margaret's fees on brief (presumably because his own expert concluded that Margaret was undercompensated in 2004), and we therefore deem respondent to have conceded this issue.

**[\*14]** amounts paid to Bruce and Donald in 2003 and 2004 were reasonable.[6] See

Rule 142(a).

The Court of Appeals for the Ninth Circuit, to which an appeal in this case

would normally lie, applies five factors to determine the reasonableness of

compensation, with no factor being determinative:  (1) the employee's role in the

---

[6]At the outset of trial petitioner contended that the notice of deficiency had lost its presumptive correctness in view of the fact that respondent had abandoned the position in the notice that reasonable compensation for Bruce and Donald was limited to $1,417,522 and $1,711,842 for 2003 and 2004, respectively, and had instead taken the position--in line with his expert's report--that reasonable compensation for them was a much higher figure for each year; namely, $3,214,000 and $6,532,000 for 2003 and 2004, respectively.

Petitioner was presumably relying on a line of cases from the Court of Appeals for the Ninth Circuit, where an appeal in this case would normally lie, holding that the Commissioner's adoption of a litigation position that substantially deviates from the position in the notice of deficiency results in a forfeiture of any presumption of correctness in the notice and places the burden of proof on the Commissioner.  See Estate of Mitchell v. Commissioner, 250 F.3d 696 (9th Cir. 2001), aff'g in part, vacating in part and remanding T.C. Memo. 1997-461; Estate of Simplot v. Commissioner, 249 F.3d 1191 (9th Cir. 2001), rev'g and remanding 112 T.C. 130 (1999); Morrissey v. Commissioner, 243 F.3d 1145 (9th Cir. 2001), rev'g and remanding Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119.

On brief, however, petitioner does not address such an argument or cite any of the foregoing cases.  Instead, petitioner states that it "has met its burden of proof in establishing that the compensation paid to Don and Bruce Johnson for 2003 and 2004 was reasonable."  We consequently deem petitioner to have abandoned any argument that the burden of proof rests with respondent.  In any event, we reach our decision on the basis that the preponderance of the evidence establishes that the disputed amounts that petitioner deducted for the years at issue constituted reasonable compensation and therefore find it unnecessary to consider further any impact of the aforementioned cases.

[*15] company; (2) a comparison of compensation paid by similar companies for similar services; (3) the character and condition of the company; (4) potential conflicts of interest; and (5) the internal consistency of compensation arrangements. Elliotts v. Commissioner, 716 F.2d at 1245-1247. In analyzing the fourth factor, the Court of Appeals emphasizes evaluating the reasonableness of compensation payments from the perspective of a hypothetical independent investor, focusing on whether the investor would receive a reasonable return on equity after payment of the compensation. Id. at 1247; see also Metro Leasing Dev. Corp. v. Commissioner, 376 F.3d 1015, 1019 (9th Cir. 2004), aff'g T.C. Memo. 2001-119.

Both parties introduced expert witness reports and testimony to support the parties' positions. Expert witness testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment. See Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). Nonetheless, the Court is not bound by an expert's opinion, and we may either accept or reject expert testimony in the exercise of sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. 547, 561-562 (1986). Furthermore, the Court may be selective in determining

**[\*16]** what portions of an expert's opinion, if any, to accept. <u>Parker v. Commissioner</u>, 86 T.C. at 562.

On brief respondent effectively concedes four of the five <u>Elliotts</u> factors that tend to support, or are at least neutral with respect to, the reasonableness of the compensation petitioner paid. As to the employees' roles and the condition of the company, respondent concedes the "significant roles" Bruce and Donald played in petitioner's "substantial success" during the years at issue. Similarly, respondent concedes that the level of petitioner's success was so great that comparisons to the compensation paid by similar companies were difficult to make and that the bonuses paid to Bruce and Donald--while unreasonable compensation in respondent's view--were nonetheless the result of a consistently applied bonus formula. Notwithstanding the foregoing, respondent argues that this case hinges on the fourth <u>Elliotts</u> factor; namely, whether a hypothetical independent investor would receive an adequate return on equity after accounting for Bruce's and Donald's compensation. Nevertheless, we consider each of the <u>Elliotts</u> factors, inasmuch as the Court of Appeals for the Ninth Circuit has indicated that no one factor is dispositive. <u>See</u> <u>Metro Leasing Dev. Corp. v. Commissioner</u>, 376 F.3d at 1019; <u>LabelGraphics, Inc. v. Commissioner</u>, 221 F.3d 1091, 1095 (9th Cir. 2000), <u>aff'g</u> T.C. Memo. 1998-343; <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1245.

**[*17]** A.    <u>Role in the company</u>

This factor focuses on the employee's importance to the success of the business.  <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1245.  Pertinent considerations include the employee's position, duties performed, and hours worked.  <u>Id.</u>

As our findings demonstrate (and respondent concedes), Bruce and Donald were integral to petitioner's success during the years at issue.  They were responsible for contract billing, onsite management and personnel supervision, and equipment modifications to meet specific project requirements.  They were known to local developers as having a hands-on management style that consistently produced a quality product on schedule.  Furthermore, under Bruce and Donald's management, petitioner's annual contract revenues increased dramatically, from approximately $4 million in 1993 to over $38 million in 2004.  While some of this growth was undoubtedly due to the housing boom in Arizona at that time, petitioner's reputation for quality and timely performance under Bruce and Donald's management allowed it to secure contracts even when it was not the lowest bidder.

Bruce and Donald also personally guaranteed indebtedness that petitioner incurred to purchase materials and supplies, adding to their role in ensuring its

**[*18]** successful operations.  See Leonard Pipeline Contractors, Ltd. v. Commissioner, T.C. Memo. 1998-315, aff'd without published opinion, 210 F.3d 384 (9th Cir. 2000); Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, aff'd, 819 F.2d 1315 (5th Cir. 1987).

This factor weighs in petitioner's favor.

B.      External comparison

This factor compares the employee's compensation with that paid by similar companies for similar services.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; sec. 1.162-7(b)(3), Income Tax Regs.  Respondent concedes that petitioner's performance so exceeded that of any of the companies identified by the parties' experts as comparable that compensation comparisons are not meaningful. Petitioner's expert calculated that petitioner's officers' compensation as a percentage of gross revenue was 18.4% and 20.9% for 2003 and 2004, respectively, whereas the industry average for those years was 2.2%.  Petitioner contends that its performance so exceeded the industry average that the divergence of its compensation from the average is justified.  On this record we lack any reliable benchmarks from which to assess petitioner's claim and therefore find it unpersuasive.  In view of this and respondent's concession, we conclude that this

**[\*19]** factor is essentially neutral.  See Multi-Pak Corp. v. Commissioner, T.C. Memo. 2010-139.

    C.    Character and condition of the company

This factor considers the company's character and condition, focusing on size as measured by sales, net income, or capital value.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.  The complexities of the business and general economic conditions are also relevant.  Id.

As reflected in our findings, petitioner experienced remarkable revenue, profit margins (before officer compensation), and asset growth during the years at issue.  Respondent concedes petitioner's "substantial success" during the years at issue.  This factor weighs in petitioner's favor.

    D.    Conflict of interest

The primary focus of this factor is whether a relationship exists between the company and the employee which may permit the company to disguise nondeductible corporate distributions as deductible section 162(a)(1) compensation payments.  Id.  A potentially exploitable relationship may exist where the employee is the company's sole or controlling shareholder or where a special family relationship indicates that the terms of a compensation arrangement are not the result of a free bargain.  Id.  Because petitioner's majority shareholder

[*20] during the years at issue was Margaret--Bruce and Donald's mother--and together the three of them owned all petitioner's stock, this factor warrants scrutiny.[7]

The Court of Appeals for the Ninth Circuit approaches this inquiry by evaluating the compensation payments from the perspective of a hypothetical independent investor, focusing on the investor's return on equity. Id. at 1247. If the company's earnings on equity after payment of compensation remain at a level that would satisfy an independent investor, there is a strong indication that the employee is providing compensable services and that profits are not being siphoned out of the company disguised as salary. Id.

The parties and their experts agree that petitioner had pretax returns on equity of 10.2% and 9% for 2003 and 2004, respectively.[8] They differ, however,

---

[7]We further note in this regard that petitioner paid dividends totaling only $50,000 and $100,000 for 2003 and 2004, respectively, notwithstanding gross profit margins (before officer compensation) for each year exceeding 38%.

[8]Although Elliotts computes return on equity on an aftertax basis--by dividing net income (i.e., income after taxes) by yearend shareholder equity, Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1247 (9th Cir. 1983), rev'g T.C. Memo. 1980-282--both parties' experts generally computed petitioner's return on equity using pretax income figures. They did so because, as respondent's expert explained, most of the available data from the companies they considered comparable provides pretax return on equity figures. Neither the parties nor their experts offer any insight concerning the possible impact of using pretax versus

(continued...)

[*21] on what an expected return on equity should have been for petitioner. Respondent's expert used return on equity figures from four sources that produced return on equity figures ranging from 13.8% to 18.3%. We find that the data on which he relied is not as reliable as that used by petitioner's expert. Respondent's expert's first return on equity figure was derived from seven "guideline companies". But these guideline companies are not comparable to petitioner as they were publicly traded, operated in industries different from petitioner's, and had gross sales substantially larger than petitioner's. His second figure was derived from company data in an annual statement published by the Risk Management Association, yet the publication itself states that its data should be used "only as general guidelines and not as absolute industry norms" because the data "may not be fully representative of a given industry" for several reasons, including that it is not randomly selected and may include small sample sizes for certain industries. His third figure is derived from the Construction Financial Management Association's annual financial survey, but many of the companies in that data sample operated in industries dissimilar from petitioner's. Finally,

---

[8](...continued)
aftertax figures, though presumably pretax returns on equity would always be higher. In these circumstances, we are constrained to evaluate this factor on the basis of pretax figures.

[*22] respondent's expert derived a "market required return on equity" from data published by Ibbotson Associates.  But that data is from companies engaged in the construction industry generally, not the concrete contracting sector of which petitioner is a part.

By contrast, petitioner's expert used return on equity figures derived from Integra Information (Integra) data.  Integra is a data service which compiles financial information of privately held companies from government and other sources.  Petitioner's expert used Integra data from 33 companies falling under SIC code 1771, Construction--Special Trade Contractors--Concrete Work, with sales ranging from $25 million to $49,999,999.  We find the companies that petitioner's expert used to be more comparable to petitioner for purposes of a return on equity analysis than those used by respondent's expert.[9]  Petitioner's expert calculated an average pretax return on equity from these 33 companies of 10.5% and 10.9% for calendar years 2003 and 2004, respectively.  Thus,

---

[9]Respondent faults the Integra company sample because it has not been shown whether any of these companies actually had independent investors (who would presumably serve as a check on excessive officer compensation).  However, the same could be said of any privately held company in the various databases that respondent's expert used.  On balance, we are persuaded that companies which are closest to petitioner with respect to the nature of the business activity and the size of annual sales provide the best index of a reasonable return on equity.  Petitioner's expert's companies were closer to petitioner in these respects.

[*23] petitioner's pretax return on equity fell 0.3 percentage points below the Integra companies' average in 2003 and 1.9 percentage points below it in 2004.

The parties disagree over the implications of these figures. Respondent argues that because petitioner's return on equity fell below the industry average in 2003 and 2004, Bruce and Donald were unreasonably compensated in those years. An independent investor would have demanded a return more commensurate with petitioner's superior performance, respondent claims. Petitioner contends that its return on equity was in line with the industry average and therefore would have satisfied an independent investor.

We agree with petitioner. Respondent cites no authority for the proposition that the required return on equity for purposes of the independent investor test must significantly exceed the industry average when the subject company has been especially successful, and we have found none in the caselaw. Instead, in applying the independent investor test the courts have typically found that a return on equity of at least 10% tends to indicate that an independent investor would be satisfied and thus payment of compensation that leaves that rate of return for the investor is reasonable. See, e.g., Thousand Oaks Residential Care Home I, Inc. v. Commissioner, T.C. Memo. 2013-10; Multi-Pak Corp. v. Commissioner, T.C. Memo. 2010-139. Indeed, compensation payments that resulted in a return on

[*24] equity of 2.9% have been found reasonable. Multi-Pak Corp. v. Commissioner, T.C. Memo. 2010-139. It is compensation that results in returns on equity of zero or less than zero that has been found to be unreasonable. See, e.g., Mulcahy, Pauritsch, Salvador & Co., Ltd. v. Commissioner, 680 F.3d 867 (7th Cir. 2012), aff'g T.C. Memo. 2011-74; Multi-Pak Corp. v. Commissioner, T.C. Memo. 2010-139. We consequently find that petitioner's returns on equity of 10.2% and 9% for 2003 and 2004, respectively, tend to show that the compensation paid to Donald and Bruce for those years was reasonable. As petitioner's expert points out, mere reductions in their collective compensation of $9,847 and $75,277 in 2003 and 2004, respectively--differences of approximately 1%--would have placed petitioner's return on equity at exactly the average for comparable companies in the concrete business. Consequently, this factor favors a finding that the compensation at issue was reasonable.

E.     Internal consistency of compensation

This factor focuses on whether the compensation was paid pursuant to a structured, formal, and consistently applied program; bonuses not awarded under such plans are suspect. Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.

Petitioner consistently adhered to the officer bonus formula from its inception in 1991. Respondent concedes as much although he argues that the

**[*25]** formula yielded unreasonable compensation during the years at issue. We conclude that this factor weighs in petitioner's favor.[10]

F.     Conclusion

As a whole, the Elliotts factors support the conclusion that the compensation petitioner paid to Bruce and Donald in 2003 and 2004 was reasonable. The brothers were absolutely integral to petitioner's successful performance, a performance that included remarkable growth in revenues, assets, and gross profit margins during those years, as respondent concedes. The return on equity petitioner generated for each year after payment of Bruce's and Donald's compensation was in line with--indeed closely approximated--the return generated by the companies most comparable to it. We accordingly conclude that an independent investor would have been satisfied with the return. For these reasons, we hold that the $4,025,039 and $7,300,916 petitioner paid as officer compensation in 2003 and 2004, respectively, were reasonable and therefore deductible under section 162(a)(1).

---

[10]At trial petitioner sought to introduce evidence pertaining to respondent's examination of petitioner's return for 1996 to show that respondent did not question the bonus formula (and therefore, in petitioner's view, approved it). We have excluded that evidence because it is irrelevant. See, e.g., Pekar v. Commissioner, 113 T.C. 158, 165-166 (1999).

[*26] II.    DBJ payment

We now address whether petitioner is entitled to deduct the $500,000 "administration fees" expense paid to DBJ and reported on its 2004 return as a business expense.

Generally, a taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including reasonable compensation for personal services actually rendered.  Sec. 162(a)(1).  Ordinary expenses are "normal, usual, or customary" in the taxpayer's trade or business.  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  In order for an expense to be ordinary there must be evidence that the transaction in question has some degree of normality in the type of business under scrutiny.  Id. at 495-496.  Absent such evidence, there must be a basis for an assumption, in experience or common knowledge, that payments sought to be deducted are to be placed in the same category as ordinary expenses.  Id. at 496-497.  Necessary expenses are expenses that are "appropriate and helpful" to a taxpayer's trade or business.  Welch v. Helvering, 290 U.S. 111, 113 (1933).  Whether an expense is ordinary and necessary is a question of fact.  Id. at 115.

Tax deductions are a matter of legislative grace, and a taxpayer has the burden of proving that he is entitled to the deductions claimed.  Rule 142(a);

[*27] <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).[11]

Petitioner argues that the $500,000 "administration fees" expense is an ordinary and necessary business expense because it constitutes a payment it made to DBJ to compensate it for securing a guaranteed supply of concrete, discounted for bulk purchases, from Arizona Materials during 2004. Respondent contends on several grounds that the $500,000 payment was not an ordinary and necessary business expense, including: (1) that there was no written agreement or evidence of any oral agreement obligating petitioner to compensate DBJ, and therefore the $500,000 payment was voluntary; (2) that DBJ performed no compensable services on behalf of petitioner; and (3) that the $500,000 payment was made not for services that DBJ provided, but for services Bruce and Donald performed in their capacities as officers of petitioner.

Respondent's arguments are unpersuasive. We are satisfied on this record that Bruce and Donald, acting through DBJ, used DBJ's controlling position in Arizona Materials to cause Arizona Materials to supply concrete to petitioner during times of shortage at favorable prices. Third-party testimony--to the effect

---

[11]Petitioner did not claim, or show entitlement to, any shift in the burden of proof under sec. 7491(a) with respect to the factual issues relevant to this deduction.

[*28] that petitioner was able to obtain concrete in 2004 at times when other concrete contractors could not--corroborates the brothers' account. Moreover, Bruce and Donald, acting in their individual capacities when their more risk-averse, controlling-shareholder mother would not allow petitioner to do so, made arrangements to form Arizona Materials to ensure petitioner's concrete supply in the face of looming shortages. They brought in other investors with industry contacts, including existing relationships with cement suppliers, cement being a critical ingredient of concrete and also exhibiting shortages. The brothers, again acting in their individual capacities and using DBJ as their vehicle, invested substantially in and guaranteed the indebtedness of Arizona Materials. Having assumed the risks associated with Arizona Materials' formation and operation in their individual capacities, Bruce and Donald could reasonably expect to be compensated by petitioner for doing so when it substantially benefited from the fruits of their efforts.[12] Petitioner also benefited from Bruce's and Donald's

---

[12]Notwithstanding substantial credible testimony to the effect that there was a concrete shortage in Arizona in 2004 and that Arizona Materials supplied concrete to petitioner when other concrete contractors had experienced supply disruptions, respondent suggests that Arizona Materials did not play a significant role in supplying petitioner concrete because petitioner purchased only $3.5 million in concrete from Arizona Materials out of a total of $13 million in concrete purchases during 2004. We disagree. That petitioner may have purchased only a little over a quarter of its concrete supply from Arizona Materials does not

(continued...)

**[\*29]** foresight and business acumen in finding a solution to the concrete shortage, even when petitioner's controlling shareholder was unwilling to commit petitioner's resources to do so.

In view of the foregoing, respondent's contention that petitioner's payment to DBJ was voluntary, given the absence of a written agreement or evidence of an oral agreement to compensate DBJ, is unavailing. "Closely held corporations, as is well known, often act informally, 'their decisions being made in conversations, and oftentimes recorded not in the minutes, but by action.'" Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 714 (1977) (quoting Reub Isaacs & Co. v. Commissioner, 1 B.T.A. 45, 48 (1924)). We are satisfied that petitioner's board, including majority shareholder Margaret, concluded at the close of 2004 that the $500,000 payment to DBJ was appropriate to compensate Bruce and Donald for the substantial benefit they conferred on petitioner in their individual capacities. In short, the action in making the payment undoubtedly reflected an informal understanding among petitioner's shareholders, Margaret, Bruce, and Donald, that the latter two ought to be compensated for their individual efforts and their

---

[12](...continued)
diminish the importance of having that concrete available when shortages occurred.

[*30] assumption of the risks entailed in averting the consequences of a concrete shortage for petitioner during 2004.

In the same vein, we do not agree with respondent that DBJ provided no compensable services to petitioner. As Bruce's and Donald's wholly owned limited liability company, DBJ was merely the entity through which the brothers implemented their plan to form and finance Arizona Materials. Through DBJ, then, petitioner received two distinct benefits: (1) Bruce's and Donald's management acumen behind a successful strategy to avert a potentially crippling concrete shortage,[13] and (2) Bruce's and Donald's assumption in their individual capacities of the risks associated with Arizona Material's formation and operation, because Bruce and Donald invested their own funds in, and guaranteed the debt of, Arizona Materials. Because Bruce and Donald each owned 50% of DBJ, the payment to DBJ compensated them for the foregoing services received by petitioner.

---

[13]While one would normally expect that Bruce and Donald, as officers of petitioner responsible for managing its operations, were already obligated to provide their management acumen without additional compensation, in the unusual circumstances presented here their management strategy had been rejected by petitioner because it was opposed by its majority shareholder. As a consequence, Bruce and Donald effectively provided their management skills to avert a concrete shortage as outside, third-party consultants.

**[*31]** For essentially the same reasons, we reject respondent's argument, premised on Stewart v. Commissioner, T.C. Memo. 2002-199, that the $500,000 payment to DBJ was actually a payment to Bruce and Donald in their capacities as officers of petitioner. In Stewart, the taxpayer sought to deduct payments made to his wholly owned corporation on the grounds that they were for the taxpayer's management services provided through the corporation to his sole proprietorship. We rejected that claim, finding that the taxpayer had provided the services in his individual capacity directly to the sole proprietorship and not as an employee of the corporation. Stewart is readily distinguishable, because here Bruce and Donald were clearly acting in their individual, rather than corporate officer, capacities in forming and financing Arizona Materials. Petitioner's controlling shareholder had expressly rejected the brothers' proposal that it acquire a concrete supplier. The brothers thereupon put their own funds and creditworthiness into Arizona Materials as individuals. The $500,000 payment petitioner made in consideration of the resulting benefits was therefore earned and received by Bruce and Donald (through DBJ) in their individual capacities.

The $500,000 payment was an ordinary and necessary expense within the meaning of section 162(a) because it was normal for a concrete contractor to expend funds in connection with ensuring a reliable supply of concrete in the face

**[*32]** of shortages, and the expenditure was helpful to petitioner's business, allowing it to meet customer demand when other companies engaged in the same business were hampered by the shortage. Petitioner is therefore entitled to deduct it.

III.     Conclusion

We conclude, and hold, that the $4,025,039 and $7,300,916 petitioner paid to Bruce and Donald as compensation in 2003 and 2004, respectively, are deductible under section 162(a)(1). We further hold that petitioner is entitled to deduct the $500,000 payment it made to DBJ in 2004 as an ordinary and necessary business expense under section 162(a).

To reflect the foregoing,

Decision will be entered for

petitioner.