T.C. Memo. 2016-216

UNITED STATES TAX COURT

TRANSUPPORT, INCORPORATED, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent<sup>*</sup>

Docket No. 12152-13.                    Filed November 23, 2016.

<u>Michael S. Lewis</u> and <u>William F. J. Ardinger</u>, for petitioner.

<u>Carina J. Campobasso</u> and <u>Kimberly A. Kazda</u>, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  In our prior opinion in this case, <u>Transupport, Inc. v.</u>

<u>Commissioner</u> (<u>Transupport I</u>), T.C. Memo. 2015-179, we held that assessments of

the deficiencies determined for 1999 through 2005 are barred by the statute of

---

<sup>*</sup>This opinion supplements our previously filed opinion <u>Transupport, Inc. v.</u>
<u>Commissioner</u>, T.C. Memo. 2015-179.

**[*2]** limitations because respondent failed to prove by clear and convincing evidence that underpayments for those years were due to fraudulent intent on the part of petitioner. After that opinion was issued, further trial was held to present expert opinion evidence on the remaining issues for the years for which assessment is not barred. The issues for determination in this opinion are whether amounts deducted for 2006 through 2008 for compensation paid to the four shareholding sons of petitioner's president, Harold Foote (Foote), were reasonable, whether respondent's determinations regarding petitioner's costs of goods sold during those years should be sustained, and whether petitioner is liable for the accuracy-related penalty prescribed by section 6662(a) for any of those years. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Because the background facts found in <u>Transupport I</u> are for the most part relevant to the issues addressed in this opinion, we incorporate certain of them verbatim from <u>Transupport I</u> and intersperse, where appropriate, additional findings based upon the expert evidence presented at the continued trial. Some additional facts have been stipulated, and these facts are incorporated in our

**[*3]** findings by this reference. Petitioner's place of business was New Hampshire when the petition was filed.

Petitioner is a supplier and surplus dealer of aircraft engines and engine parts for use in military vehicles, including helicopters, airplanes, and tanks. It primarily purchased surplus parts from the Government in bulk lots that contained parts having little value as well as parts that petitioner wanted for its business. Petitioner bought the lots to acquire items that it expected to sell but also ended up with items that would not be sold. The costs of particular items were not specified as part of the purchase transactions.

Petitioner was also a distributor of parts. The distributorship line of business is referred to in the record as the Goodrich line. Distributorship purchases were of specific parts, and the individual item costs were traceable. The purchased distributorship items were susceptible of accurate inventory accounting, and some computer records were kept in later years; but an accurate inventory was never made part of petitioner's financial and tax reporting.

Petitioner was not a manufacturer. If aircraft engines required overhaul, petitioner sent the work out to be performed by others. The correct category for comparing petitioner's business with other businesses for purposes of determining reasonable compensation is wholesaler.

**[*4]** Foote, its president and chief executive officer, founded petitioner in 1972. During the years in issue Foote and his four sons, William Foote (W. Foote), Kenneth Foote (K. Foote), Richard Foote (R. Foote), and Jeffrey Foote (J. Foote) were petitioner's only full-time employees and officers. None of petitioner's officers is an accountant. Each of the officers performed various and overlapping tasks for the company, including tasks that might have been performed by lower level employees. The officers performed no supervisory functions.

In 1999 Foote owned 98% of petitioner's stock. The other 2% was owned by Richard Smith, an unrelated person. As of December 31, 2004, petitioner had issued, and had outstanding, 1,000 shares of class A voting common stock and 9,000 shares of class B nonvoting common stock. On August 8, 2005, Foote transferred 2,250 shares of class B nonvoting common stock to each of his four sons. Accordingly, after this transfer, Foote owned 1,000 shares of class A voting common stock and his four sons each owned 2,250 shares of class B nonvoting common stock.

Starting in the mid-to-late 1970s, petitioner retained Elaine Thompson as its accountant, and she served as petitioner's outside accountant until she died in 2010. Thompson was a certified public accountant (C.P.A.), was a name partner

**[*5]** in her firm, and was the first female president of the Connecticut Society of Certified Public Accountants.

Petitioner provided to Thompson handwritten summaries, usually prepared by J. Foote.  Thompson, through her accounting firm, prepared compiled financial statements for petitioner for 1990 through 2008 that were based upon the summaries and upon financial information that petitioner maintained.  The financial statements were not audited by Thompson or her firm, and the information on the summaries was never verified by Thompson or her firm.  In a memorandum dated December 22, 2000, Thompson advised Foote that "any inventory increase creates more income".

Petitioner filed Form 1120, U.S. Corporation Income Tax Return, for each of the years in issue.  Thompson prepared petitioner's Forms 1120 using the same financial information that petitioner provided in connection with preparation of petitioner's compiled financial statements.

On petitioner's returns the inventory and cost of goods sold amounts were reported as follows:

[*6]

| Year | Inventory purchases | Ending inventory | Cost of goods sold | Cost of goods sold as a % of sales |
|---|---|---|---|---|
| 1990 | $2,438,837 | $349,036 | $2,411,031 | 70.2 |
| 1991 | 2,411,063 | 504,265 | 2,293,132 | 69.0 |
| 1992 | 5,722,070 | 517,336 | 5,766,439 | 83.2 |
| 1993 | 2,992,018 | 575,808 | 2,989,565 | 71.5 |
| 1994 | 2,889,862 | 595,180 | 2,942,558 | 70.1 |
| 1995 | 5,735,674 | 698,584 | 5,715,005 | 79.6 |
| 1996 | 4,534,762 | 671,351 | 4,635,362 | 72.2 |
| 1997 | 8,442,613 | 700,851 | 8,466,177 | 80.5 |
| 1998 | 5,025,653 | 725,921 | 5,095,312 | 70.6 |
| 1999 | 4,582,833 | 731,783 | 4,619,035 | 68.0 |
| 2000 | 6,823,574 | 876,651 | 6,749,058 | 69.0 |
| 2001 | 5,653,767 | 1,488,289 | 5,086,870 | 63.5 |
| 2002 | 6,962,709 | 1,232,117 | 7,266,115 | 68.8 |
| 2003 | 5,523,832 | 1,553,889 | 5,264,284 | 64.4 |
| 2004 | 5,643,235 | 1,520,813 | 5,724,397 | 62.4 |
| 2005 | 5,401,471 | 1,389,847 | 5,603,004 | 68.1 |
| 2006 | 7,160,157 | 1,657,697 | 6,951,132 | 66.6 |
| 2007 | 6,510,873 | 1,867,257 | 6,365,543 | 60.7 |
| 2008 | 8,257,286 | 2,662,956 | 7,519,086 | 63.0 |

**[*7]** Costs of goods sold reported as percentages of purchases ranged from 91% for 2008 to over 100% for 1999, 2002, 2004, and 2005.

The Internal Revenue Service (IRS) audited petitioner's Forms 1120 for 1982 and 1983 in 1984. The IRS audited petitioner's Forms 1120 for 1988, 1989, and 1990 in 1992. During each of the audits the examining agent was aware that petitioner did not maintain a physical inventory of the unsold parts in its warehouse and backed into the closing inventory, reported in its returns, by using a percentage of sales as costs of goods sold. The examining agent conducting the audit for 1990 was advised that some surplus items had been sold at amounts in excess of 100% gross profit, but he accepted petitioner's representation that, on the basis of Foote's experience in selling the surplus items, petitioner had averaged approximately a 30% gross profit margin. Although the examining agents in each audit informed Foote or petitioner's C.P.A. that petitioner should maintain a physical inventory, the costs of goods sold were adjusted only to reflect a minor change in the purchases that petitioner made in 1983.

In 2000, 2002, 2004, and 2005, petitioner obtained appraisal reports that presented a valuation analysis of the fair market value of petitioner's stock as of December 31, 1999, 2001, 2003, and 2004, respectively. The appraisal reports were obtained in relation to Foote's intent to make gifts of stock to his sons. After

**[*8]** the first appraisal, Foote objected to the appraised value because the appraiser's value would make it harder for Foote to give petitioner's stock to his sons. Foote later gave his sons stock valued at the maximum allowed without gift tax liability and arranged for his sons to pay the balance of the purchase price over a period of years. Foote and W. Foote were familiar with the estate and gift tax consequences of such gifts. Foote was also familiar with the marginal income tax rates applicable to him and to his sons. Foote alone determined the compensation payable to his sons. He did not consult his accountant or anyone else in determining their compensation. The only apparent factors considered in determining annual compensation were reduction of reported taxable income, equal treatment of each son, and share ownership.

On its Forms 1120 for 1999 through 2008, petitioner deducted the following amounts as compensation:

[*9]

| Officer | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Foote | $478,528 | $593,587 | $538,213 | $538,269 | $428,291 | $513,152 | $213,194 | $353,211 | $478,993 | $599,858 |
| R. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| K. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| J. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| W. Foote | 255,000 | 425,000 | 407,500 | 495,000 | 425,000 | 510,000 | 390,000 | 575,000 | 675,000 | 720,000 |
| Others | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 5,952 | 8,366 | 6,323 |
| Total | 1,498,528 | 2,293,587 | 2,168,213 | 2,518,269 | 2,128,291 | 2,553,152 | 1,773,194 | 2,659,163 | 3,187,359 | 3,486,181 |
| Gross sales | 6,796,928 | 9,781,839 | 8,004,622 | 10,563,463 | 8,174,258 | 9,174,563 | 8,227,003 | 10,439,336 | 10,483,854 | 11,943,576 |
| % | 22.047% | 23.447% | 27.087% | 23.839% | 26.037% | 27.829% | 21.553% | 25.473% | 30.403% | 29.189% |

**[\*10]** The only dividend petitioner reported paid over the same 10-year period was $47,759 for 2003, in the form of unrealized cash surrender value of life insurance. No dividends were paid during 2006, 2007, or 2008.

The closing inventory reported on each of petitioner's Forms 1120 for 1999 through 2008 was: $731,783, $876,651, $1,488,289, $1,232,117, $1,553,889, $1,520,813, $1,389,847, $1,657,697, $1,867,257, and $2,662,956, respectively.

In 2007 Foote considered selling petitioner. On May 3, 2007, petitioner entered into a nondisclosure agreement with Richard Lodigiani of BTS New England, Inc. Foote provided Lodigiani with estimates of inventory and profit margins on surplus parts. Lodigiani prepared several drafts of a document titled "Confidential Offering Memorandum". The drafts were based on information provided by Foote, by J. Foote, and by Thompson. The drafts included a "Recast Financial Summary", in which the profits of petitioner's operations as reported on its financial statements and tax returns were substantially improved. Explanatory notes on the Recast Financial Summary were as follows:

> Five shareholder salaries recast to market rate of $50,000 annually each.

> Management has elected to use an accounting method that writes off the majority of inventory as purchased. It is conservatively estimated that actual gross profit on sales exceeds 75% on general part sales and 33% on distributor sales (approx. 20% of sales). Management

[*11] believes that non-obsolete inventory on hand exceeds $100,000,000.00 at cost. The inventory adjustment shown above adjusts annual gross profit using the formula of 33% x distributor sales and 75% x general parts sales.

Documents that Lodigiani prepared also included an executive summary that included the following statement:

The company generates average gross profits exceeding 75% on the general parts sales and approximately 33% on the Goodrich distributorship sales. Project 07' [sic] sales are approximately $12,000,000.00. The company operates with no formal marketing and very limited web presence. Growth throughout the world to the thousands of users of these turbine engines is unlimited. The company currently has inventory in excess of $100,000,000.00 at cost with a retail market value that exceeds $500,000,000.00.

J. Foote provided to Lodigiani a document captioned "Honeywell 2007 T53 Price Book Effective: Jan 1, 2007" (Honeywell list) that listed parts, stock quantities, and extended prices totaling $312,413,888.70, which J. Foote represented to be "reasonably accurate". The Honeywell list was prepared by W. Foote, whose duties for petitioner included inventory management. The cost of a single type of nozzle listed on the Honeywell list in petitioner's inventory in 2007 was approximately $800,000. Another sample of items on the Honeywell list in stock in 2007 had purchase prices totaling over $11 million. The lower of cost or market value of the items on the Honeywell list alone far exceeded the total inventory values reported on petitioner's financial statements and tax returns.

[*12] Foote also provided prospective purchasers with information about engines in inventory in 2007. The estimated cost of a sample of the engines (identified by Foote in his trial testimony) was approximately $2,440,000, and Foote estimated the retail value at $60 million. By any measure, petitioner's inventory at cost or market value in 2007 far exceeded the inventory values reported on petitioner's correlating financial statements and tax return.

Copies of the documents prepared by Lodigiani were provided to prospective purchasers, including Beran Peter (B. Peter), Patrick Bromley, and Peter LaHaise. Although B. Peter submitted a letter of intent expressing terms for acquisition of 60% of petitioner, no agreements with respect to transfer of petitioner were reached. During his conversations with prospective purchasers, Foote never disavowed the information set forth in the Lodigiani documents.

On February 12, 2008, LaHaise submitted an application for a whistleblower award to the IRS Whistleblower Office. LaHaise and his lawyers met with IRS personnel in relation to his application. LaHaise believes that he could receive $13 million if respondent is successful in this matter.

On January 20, 2009, the IRS commenced an audit of petitioner's returns for 2006 and 2007. The audit was conducted by Revenue Agent Robert Canale. By early October 2009 the audit was expanded to include 1999 through 2005.

[*13] Petitioner provided invoices and purchase orders to Canale, and Canale toured petitioner's premises. Canale spoke by telephone with Thompson, who was ill and had moved to Illinois, and interacted with one of the members of Thompson's firm. Canale interviewed and obtained documents from Lodigiani, B. Peter, Bromley, and LaHaise.

Frank J. Wojick, Jr., a senior appraiser and valuation specialist for the IRS, was assigned to assist Canale in the audit. Petitioner gave Wojick complete and unlimited access to all of petitioner's business for his review and analysis and welcomed Wojick to its facilities. Wojick toured petitioner's facilities with J. Foote on September 21, 2009. Wojick was permitted to take photographs of the exterior and interior of petitioner's warehouse. Neither Wojick nor Canale attempted to conduct an inventory valuation of the parts in petitioner's warehouse.

Wojick prepared a reasonable compensation analysis that was used in preparation of the notices of deficiency. He had done some reasonable compensation studies previously but had never testified as a reasonable compensation expert in court. Some of his studies had led to accepting the taxpayer's claimed compensation deduction. As a source of information he consulted a database from the Economic Research Institute with the assistance of another IRS employee who regularly provided such information. He also

**[\*14]** reviewed petitioner's 2006 tax return, a general description of its business, and résumés of its officers. He did not, however, interview the Footes with regard to their duties performed for petitioner.

To find the appropriate category for petitioner's business, Wojick first looked at the industry code reported on petitioner's 2006 tax return, which was 423990, designating "Other Miscellaneous Durable" under the heading "Wholesale Trade". Because that code was too general, he searched for the term "aircraft parts" and found aircraft parts manufacturers. Wojick did not realize that the "aircraft parts manufacturers" category did not include wholesalers, such as petitioner. Wojick also used a database for executives' compensation rather than a broader salary base. He used the median salary reflected in that database and extrapolated from 2006 to the other years in issue.

The notice of deficiency determined reasonable compensation of petitioner's officers, as follows:

**[*15]**

| Officer | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Foote | $285,388 | $294,215 | $303,314 | $312,695 | $322,366 | $332,336 | $342,615 | $353,211 | $363,807 | $374,722 |
| R. Foote | 201,996 | 208,243 | 214,684 | 221,323 | 228,168 | 235,225 | 242,500 | 250,000 | 257,500 | 265,225 |
| K. Foote | 181,796 | 187,419 | 193,215 | 199,191 | 205,351 | 211,703 | 218,250 | 225,000 | 231,750 | 238,703 |
| J. Foote | 181,796 | 187,419 | 193,215 | 199,191 | 205,351 | 211,703 | 218,250 | 225,000 | 231,750 | 238,703 |
| W. Foote | 181,796 | 187,419 | 193,215 | 199,191 | 205,351 | 211,703 | 218,250 | 225,000 | 231,750 | 238,703 |
| Reasonable compensation | 1,032,772 | 1,064,714 | 1,097,643 | 1,131,591 | 1,166,589 | 1,202,669 | 1,239,865 | 1.278,211 | 1,316,557 | 1,356,056 |
| Amounts per return | 1,498,528 | 2,293,587 | 2,168,213 | 2,518,269 | 2,128,291 | 2,553,152 | 1,773,194 | 2,653, 211 | 3,178,993 | 3,479,860 |
| Adjustment | 465,756 | 1,228,873 | 1,070,570 | 1,386,678 | 961,702 | 1,350,483 | 533,329 | 1,375,000 | 1,862,436 | 2,123,804 |

Notation:
Tax year 2006 determined compensation for median value employed officers.  For years before 2006 3% decrease applied.  For years after 2006 3% increase applied.

**[*16]** In the notices of deficiency petitioner's costs of goods sold were adjusted to reflect a 25% cost and a 75% profit on petitioner's sales of surplus parts. Compensation to petitioner's officers other than Foote was reduced to reflect reasonable allowances for their compensation. The notices also determined that all or part of the underpayments of tax were due to fraud and, to the extent that the fraud penalty did not apply, that an accuracy-related penalty under section 6662(a) did apply. The determinations were made on the basis of the admissions in the documents that Lodigiani prepared and statements that Foote made to Canale.

## OPINION

In Transupport I, we found that respondent had failed to prove fraudulent intent, but we concluded that an underpayment for each year was proven by clear and convincing evidence that petitioner understated the value of its inventory at the end of each year. As a result, petitioner's costs of goods sold were consistently overstated. Petitioner ignores our findings and objective evidence that a portion of the inventory of parts in both the Goodrich line and the spare parts line of the business exceeded the inventory reported. With respect to the reasonable compensation issue, petitioner ignores the repeated examples of the professed ignorance of its officers concerning matters allegedly within their areas of responsibility. Petitioner also continues to deny the assertions and admissions

**[*17]** of Foote and his four sons concerning items in inventory and petitioner's method of accounting for costs of goods sold. Finally, petitioner ignores our conclusion that it did not reasonably rely on its accountant to determine the amounts reported on its tax returns. It might have been expected that petitioner's evidence and arguments would have been adjusted to address our findings and our views of the evidence, but they were not. We are not persuaded that our expressed findings and views of the factual evidence in Transupport I were erroneous.

The evidence at the continued trial consisted of dueling experts on the reasonable compensation and costs of goods sold issues. Petitioner's experts conveniently ignored facts concerning the officers' qualifications and the actual inventories. We must decide here whether any of those experts provided reliable evidence to sustain the parties' respective burdens of proof or to adjust amounts determined in the statutory notice. For the reasons discussed below, we conclude that they did not.

The determination of whether expert testimony is helpful to the trier of fact is a matter within our sound discretion. See Laureys v. Commissioner, 92 T.C. 101, 127 (1989). An expert is not helpful to the Court and loses credibility when giving testimony tainted by overzealous advocacy. Id. at 127-129 (citing Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), and Messing v.

**[\*18]** Commissioner, 48 T.C. 502, 512 (1967)); see Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 335 (2011); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 86-87 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160; Jacobson v. Commissioner, T.C. Memo. 1989-606. An expert who is merely an advocate of a party's position does not assist the trier of fact in understanding the evidence or in determining a fact in issue. See Sunoco, Inc. v. Commissioner, 118 T.C. 181, 183 (2002); see also Snap-Drape, Inc. v. Commissioner, 105 T.C. 16, 20 (1995), aff'd, 98 F.3d 194 (5th Cir. 1996). Expert opinions that disregard relevant facts affecting valuation or exaggerate value to incredible levels are rejected. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 244 (1990); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734-735 (1985).

In most cases, as in this one, there is no dispute about the qualifications of the experts. The problem is created by their willingness to use their résumés and their skills to advocate the position of the party who employs them without regard to objective and relevant facts, which is contrary to their professional obligations. See Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990). We conclude that petitioner's experts disregarded objective and relevant facts and did not reach

[*19] independent judgments, as is apparent from their stated opinions that petitioner's reported income and deductions were correct as claimed on the returns filed. We know from the factual evidence that the returns were consistently inaccurate and that the deductions were excessive. Thus, the experts' opinions fail a sanity check. Respondent's experts lacked complete information and acknowledged weaknesses. As a result the parties were most effective in cross-examination and exposing flaws in the work of their adversaries, leaving us with little to rely on other than the allocation of the burden of proof.

As a general rule the taxpayer must show that the notice of deficiency determinations are erroneous, and it specifically bears the burden of proof regarding deductions. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Delaney v. Commissioner, 99 F.3d 20, 23 (1st Cir. 1996), aff'g T.C. Memo. 1995-378); United States v. Rexach, 482 F.2d 10, 15-17 (1st Cir. 1973).

We reject petitioner's claim that it is entitled to shift the burden of proof under section 7491(a)(1). For reasons discussed below we cannot describe petitioner's evidence as credible with respect to reasonable compensation or costs of goods sold. Petitioner has not complied with the requirements to substantiate those items and has not maintained all records required with respect to inventories.

[*20] See sec. 7491(a)(2)(A) and (B). Because the financial records and tax returns are unreliable and erroneous, we cannot determine whether petitioner satisfies the net worth limitation applicable to corporations. See secs. 7430(c)(4)(A)(ii), 7491(a)(2)(C). (Section 7491(c), with respect to penalties, applies only to individuals.)

Respondent has the burden, however, with respect to new matters and the increased deficiency that would result from accepting the conclusions of respondent's compensation expert. See Rule 142(a).

Reasonable Compensation

Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered under section 162(a)(1). A taxpayer is entitled to a deduction for salaries or other compensation if the payments were reasonable in amount "under all the circumstances" and are in fact payments purely for services. Sec. 1.162-7(a), (b)(3), Income Tax Regs.

Whether the compensation paid by a corporate taxpayer to a shareholder-employee was reasonable is a question of fact. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1323 (5th Cir. 1987), aff'g T.C. Memo. 1985-267;

[*21] Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), aff'g T.C. Memo. 1973-130.  Each case must be decided on the basis of the particular facts and circumstances.  Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), aff'd, 965 F.2d 1038 (11th Cir. 1992).

In making the factual determination, courts have considered various factors in assessing the reasonableness of compensation, such as:  employee qualifications; the nature, extent, and scope of the employee's work; the size and complexity of the business; prevailing general economic conditions; the employee's compensation as a percentage of gross and net income; the shareholder-employees' compensation compared with distributions to shareholders; the shareholder-employees' compensation compared with that paid to non-shareholder-employees; prevailing rates of compensation for comparable positions in comparable concerns; and comparison of compensation paid to a particular shareholder-employee in previous years where the corporation has a limited number of officers.  Charles Schneider & Co. v. Commissioner, 500 F.2d at 151-152.  No single factor is dispositive.  See Pepsi-Cola Bottling Co. of Salina v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), aff'g 61 T.C. 564 (1974).  Special scrutiny is given in situations where a corporation is controlled by the employees to whom the compensation is paid because there is a lack of arm's-

[*22] length bargaining. <u>Charles Schneider & Co. v. Commissioner</u>, 500 F.2d at 152; <u>Heil Beauty Supplies, Inc. v. Commissioner</u>, 199 F.2d 193, 194 (8th Cir. 1952).

In <u>Haffner's Serv. Stations, Inc. v. Commissioner</u>, 326 F.3d 1, 3-4 (1st Cir. 2003), <u>aff'g</u> T.C. Memo. 2002-38, the Court of Appeals for the First Circuit considered whether various multifactor tests or a single "independent investor" test would be applied, stating: "There is always a balance to be struck between simplifying doctrine and accuracy of result, and for the present we think that multiple factors often may be relevant." <u>Id.</u> at 4. With respect to the taxpayer's suggestion that the independent investor test should be adopted in the First Circuit, the Court of Appeals continued: "The problem is that the <u>actual</u> payment --ordinarily a good expression of market value in a competitive economy--does not decisively answer this question where the employee controls the company and can benefit by re-labeling as compensation what would otherwise accrue to him as dividends." <u>Id.</u> Petitioner acknowledged as much in the marketing materials prepared in 2007, in which "[f]ive shareholder salaries [were] recast to market rate of $50,000 annually each."

As in many family enterprises each of the Foote sons was involved early on in the business and did what needed to be done to keep the family business

[*23] successful. Compensation in closely held businesses is subject to close scrutiny because of the family relationships and is determined by objective criteria and comparisons with compensation in other businesses where compensation is determined by negotiation and arm's-length dealing.

Petitioner argues that this case should follow the approach of a specific Memorandum Opinion, H.W. Johnson, Inc. v. Commissioner, T.C. Memo. 2016-95. Memorandum Opinions, however, are by their nature dependent on the specific facts of the specific case, and what is reasonable compensation must be decided on the basis of the particular facts and circumstances. The circumstances in H.W. Johnson are dissimilar and clearly distinguishable. In that case the company had over 200 employees, and the sons of the founder each supervised over 100 employees. Compensation was determined by a formula consistently applied by the board of directors, and, upon the advice of the company accountant, cash dividends were paid. Petitioner's claim that the case is on "all fours" with this one is nonsense.

In Transupport I, we quoted portions of the testimony of each of the Foote sons in which each denied knowledge of principles basic to the performance of his respective functions on behalf of petitioner. Because petitioner ignores the evidence, we repeat our observations here: K. Foote worked closely with

[*24] purchases and sales but had "no clue" as to how much the inventory was worth and did not know how costs of goods sold were determined. J. Foote, who acted as petitioner's chief financial officer, testified that he had "no idea" or "not a clue" about petitioner's inventory at cost in 2007. J. Foote provided to petitioner's accountant the numbers used in preparing petitioner's tax returns, but he had no idea whether the amounts reported on the returns were correct. W. Foote, whose duties included inventory management, asserted that "nobody understands * * * our inventory" or that nobody can put a total valuation on it. As to a specific part in the inventory, he had "no earthly clue" as to the purchase price.

None of the Foote sons had special experience or educational background. Each of the four sons testified that they had overlapping duties, but those duties included menial tasks as well as managerial ones because there were no other employees. Foote testified that he intended to treat his sons equally, that he alone determined their compensation, and that he was aware of their marginal tax rates, obviously intending to minimize petitioner's tax liability. The amounts and equivalency of the brothers' compensation, the proportionality to their stock interests, the disproportionality to Foote's compensation, the manner in which Foote alone dictated the amounts, the reduction of reported taxable income to minimal amounts, and the admissions in the promotional materials relating to their

**[*25]** compensation all justify skepticism toward petitioner's assertions that the amounts claimed on the returns are reasonable.

Petitioner's compensation expert, Stephen Kirkland, did not consider or adjust for any of the foregoing factors. He disregarded sources and criteria that he used in other cases and that would have resulted in lower indicated reasonable compensation amounts. He used only one source of data although in his writings and lectures he had urged others to use various sources. Although he testified that he was an expert in "normalizing owner compensation", which is "adjusting the numbers to what they think a buyer might experience", he did not attempt to do so in this case--purportedly because he was not doing a business valuation. But in attempting to justify the compensation paid to the Foote sons in the absence of material reported earnings, he assumed that petitioner increased in value from year to year.

Kirkland assumed that petitioner was a manufacturer, which it was not, and he justified his statement by claiming that selling surplus parts to military buyers and distributing parts to manufacturers was "part of the process" of manufacturing. He placed petitioner's officers in the 90th percentile of persons in allegedly comparable positions, which their own testimony shows that they were not. He determined aggregate compensation of the top five senior executives in companies

**[*26]** included in his single database while acknowledging that the titles assigned and duties performed by petitioner's officers, as they themselves indicated during his interviews of them, were not typical of persons holding senior executive offices. He understood that the compensation in this case was set solely by Foote and was not the result of negotiation or arm's-length dealing, but he ignored that factor. He relied completely on the representations of the Footes and did not consult any customers or other third parties because he thought the Footes were "honest to a fault" although their representations to prospective purchasers and their testimony during the first trial session suggest otherwise.

Although his report discussed officer retainment as a reason for high compensation, Kirkland did not consider the unlikelihood--as confirmed by the Footes' testimony--that any of the sons would ever leave petitioner's employ, even if he were paid less. He did not calculate the return on investment in evaluating petitioner's worth, choosing instead to use 110% of sales, which did not depend on the accuracy of petitioner's disparate net profit claims. On cross-examination, he attempted to justify his conclusions by totally inapt comparisons to lawyers and doctors who do not understand their accounting systems, to Amazon, Uber, and Airbnb, which do not rely on current reported earnings to show stock value, and to his cousin who went into bankruptcy and lost her home.

[*27]  The clue to Kirkland's approach to the case is in his description of his assignment, which he described as "to perform analyses and determine whether the amounts paid by Transupport, Inc. for the services provided by its Officers during calendar years 1999 through 2008 were fair and reasonable."  In other words his assignment was to validate and confirm that the amounts reported on petitioner's returns were correct.  To do so he determined the "Maximum Reasonable Compensation Estimate" for individual officer positions and combined them to justify a total for all positions.  For example, with respect to petitioner's chief financial officer, J. Foote, whose professed ignorance about accounting issues is quoted above, Kirkland relied on a résumé describing J. Foote's education as including completion of courses in accounting at New Hampshire Technical Institute in Concord, N.H., during 1995-96.  Kirkland determined compensation for a chief financial officer, as follows:

| Year | Total cash mean | Total cash maximum | Total all |
|------|------|------|------|
| 2006 | $193,654 | $409,558 | $495,338 |
| 2007 | 198,814 | 421,735 | 506,337 |
| 2008 | 208,847 | 444,346 | 532,364 |

J. Foote's compensation during those years, equal to compensation paid to each of his three brothers, was $575,000, 675,000, and 720,000 respectively.  J. Foote was

[*28] the officer who provided financial information that was used by the accountant in preparing the tax returns, so his lack of knowledge is material. Because the premise of paying all of the sons equally was allegedly to avoid competition among them, we will not try to compare their respective importance to petitioner's operations. However, Kirkland's treatment of J. Foote's duties, qualifications, and compensation is simply an example of the approach throughout Kirkland's report that indicates that it is result oriented rather than an independent and objective analysis. We agree with the testimony of respondent's expert Gregory Scheig in rebuttal to Kirkland:

> Q     Mr. Scheig, are more databases, if they reconfirm the conclusion, is it better to use more databases or is it a less valid method?
>
> A     All databases, Your Honor, relate to a survey. All the surveys are based on different samples of different universes of numbers for different time periods, for different job classifications, for different titles, for different industries.
>
> I felt like, by looking at five different data sources, some of them in the region, some of them in the nation, some of them by profit, some of them by other factors, and basically they all basically fit within a reasonable band of conclusions.
>
> I could have, you know, by picking the median I made sure I wasn't influenced upward or downward by outliers, and in my opinion, checking five different data sources and looking for corroboration is better than using one data source, one code, and picking the biggest number on every single page.

[*29] Kirkland picked the biggest numbers to reach a maximum compensation conclusion. Overall, neither Kirkland's analysis nor his opinion is reliable.

The parties argue extensively in their briefs about application of the independent investor test that has been applied in other cases. None of the experts relied on that test in his original report or presented reliable computations from petitioner's financial statements or tax returns. Petitioner's statements and returns reported minimal yearly income, so its expert ignored them. Respondent's determinations increased petitioner's income for each year, so relying on recomputed amounts did not serve respondent. In any event the independent investor test cannot reasonably be applied in this case because we have no reliable evidence of actual return on investment. We do know that petitioner represented to prospective investors that the profitability actually experienced far exceeded the amounts reported on petitioner's financial statements and tax returns because of the methodology used in determining costs of goods sold and the availability of replacements for petitioner's officers at much lower compensation. Moreover, and most significantly, no prospective buyer was willing to rely on any of the claims of profitability made during the efforts to sell petitioner.

Respondent did not rely on Wojick as an expert on compensation at trial but instead called Scheig, a qualified compensation expert. Scheig opined that

**[\*30]** reasonable compensation to each of the Foote sons would be less than what was determined in the notices of deficiency. He used a database for wholesalers, a general salary table, and a median range of compensation. Thus, he reached lower amounts for reasonable compensation for each of the sons than Wojick had determined or than had been applied in the notices of deficiency.

Petitioner argues that respondent's switch from the amounts in the notices justifies switching the burden of proof to respondent on the compensation issue. Petitioner cites Estate of Abraham v. Commissioner, 408 F.3d 26 (1st Cir. 2005), aff'g T.C. Memo. 2004-39, amended 429 F.3d 294 (1st Cir. 2005), for the undisputed proposition that the Commissioner bears the burden of proof on a new matter. In that case, however, the Court of Appeals observed that a theory that merely clarifies or develops the original determination is not a new matter. Id. at 35 (citing Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989)). The court held that the taxpayer retained the burden of proof and commented that the taxpayer "relies for its burden shifting argument on cases with very different facts and which are easily distinguishable." Id. at 36. The same may be said here.

Petitioner contends that respondent's change shows that the original determination was arbitrary, relying on Estate of Mitchell v. Commissioner, 250 F.3d 696 (9th Cir. 2001), aff'g in part, vacating and remanding in part T.C. Memo.

[*31] 1997-461.  (This suggestion may have been based on a comment by the Court during pretrial discussions in which the parties were urged to compromise the compensation and costs of goods sold issues or perhaps submit them to arbitration before mediators who could proceed without the expense and limitations of trial.)  However, in that estate tax case, the Commissioner's expert derived lower valuations than those determined in the statutory notice, leading to a reduced deficiency and causing the Court of Appeals to conclude that the amounts in the statutory notice had been abandoned.  That was not the situation in Estate of Abraham and is not the situation here.  Petitioner had advance notice of respondent's positions and conducted extensive depositions.  There was no surprise at trial and no unfairness in respondent's more fully supported and justified recomputation of petitioner's deductions for compensation to the Foote sons.  No different evidence on petitioner's part was required because petitioner always had the burden of proving its deductible compensation, and that burden would not be satisfied by cross-examination of respondent's expert.  If respondent had not presented any expert on compensation, petitioner would still be required to justify the amounts claimed on the returns, and none of the evidence does that.

[*32]   Respondent acknowledges that the burden of proof on an increased deficiency is on respondent but disagrees that the burden has shifted insofar as petitioner's obligation to show that the amounts in the notices were erroneous. To show that the determinations in the statutory notice were not arbitrary, respondent called Wojick to explain his methodology, as described in our findings of fact. Wojick's testimony explained that respondent's position was based on information that respondent's counsel acquired from the testifying expert, Scheig. If Wojick had used the same databases as Scheig, his determinations of reasonable compensation to each of the Foote sons would have been lower, leading to a higher deficiency. We believe Wojick pursued a thoughtful approach in determining the reasonable compensation amounts contained in the notices of deficiency, and any identified errors favored petitioner.

It is significant that petitioner's expert Kirkland used many of the same assumptions as Wojick although he adopted the maximum compensation shown for the various categories of officers. For the reasons discussed above, (1) we believe that Wojick's results, however determined, were more reasonable than Kirkland's opinions and (2) we reject petitioner's argument that presenting a different expert witness with a refined approach to a problem and a different conclusion is a new issue on which respondent should bear the burden of proof.

**[*33]**  On the basis of the testimony of all of the experts on compensation, we accept the approach of Wojick as rational and not arbitrary or unreasonable.  Thus petitioner bears the burden of proving the reasonableness of amounts in excess of those allowed in the statutory notice.  Because petitioner's expert's opinion disregards the objective evidence and makes unreasonable assumptions, we hold that petitioner has failed to satisfy that burden.

The question remains, however, of whether respondent's expert, Scheig, has justified lowering compensation determined in the statutory notice as to Foote and his sons.  Scheig used five different analyses based on five different data sets.  Scheig opined that the total aggregate reasonable compensation for 2006, 2007, and 2008 was $874,027, $902,359, and $928,117, respectively.  Scheig's result, like Kirkland's, uses total compensation because of the overlapping duties of petitioner's officer-employees.  If the Foote sons had explained their duties and disavowed their knowledge and qualifications to the experts as they did during their trial testimony, respondent's position might be stronger.  On balance, however, the failure to secure information from petitioner's officers and notably the failure to consider Foote's compensation separately undermines the reliability of Scheig's conclusions as to the comparisons between the Foote sons and others in comparable positions.

**[\*34]**   Scheig's result is unpersuasive primarily because respondent has not seriously challenged the compensation paid to Foote.  Wojick testified that he did not adjust the compensation paid to Foote, the founder and chief executive officer of petitioner, because Foote's salary for 2006 was within the median range of his database.  The challenges made by respondent and in this opinion as to the lack of qualifications and professed ignorance of the Foote sons do not apply to Foote.  Respondent argues throughout that we should rely on Foote's statements about the profitability of the surplus line of business because he was the most knowledgeable about petitioner's business.  We are convinced that petitioner's success was due primarily to Foote even as he sought to reduce his role or sell petitioner, and his compensation has not been shown to be excessive.  Compensation of the sons, however, appears solely related to their shareholdings and to Foote's desire to transfer his wealth to them equally.  If we deduct the compensation of Foote, i.e., $353,211, $478,993, and $599,858 for 2006, 2007, and 2008, the amount allocable to each of the four sons by Scheig is less than any amounts derived from the sources used by the experts.  That is, available compensation to be allocated would be approximately $520,000 divided by 4 for 2006 ($130,000), $423,000 divided by 4 for 2007 ($105,750), and $328,000 divided by 4 for 2008 ($82,000).  Because none of the evidence suggests that

[*35] reasonable compensation to the sons should decline during those years, the result of Scheig's analysis is unacceptable.  Respondent thus has not proven that the deficiencies determined in the statutory notice should be increased.

Costs of Goods Sold

Petitioner's approach to its accounting for costs of goods sold is that the consistent pattern over the years 1999-2008 is self-proving.  See Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), aff'g per curiam T.C. Memo. 1969-159.  Petitioner relies solely on percentages reported on its self-generated documents over 19 years as proof of profit percentages, but no historic evidence of actual percentages realized was ever produced.  In other words petitioner asserts that the percentage of gross profit reported is evidence of the percentage of gross profit realized--circular reasoning that ignores the evidence that the percentage of reported gross profits actually varied, that the financial statements were unreliable because of the greatly understated inventories at the beginning and end of each year, and that (according to Foote and confirmed by the correlation between purchases and reported costs of goods sold) current purchases were written off during the years without regard to whether the items were added to the inventory or sold.

**[\*36]**  We explained in <u>Transupport I</u> why evidence of actual inventories at specific times showed that petitioner's reported costs of goods sold were excessive and resulted in an underpayment of tax for each year before the Court.  Petitioner's expert, Michael Thompson, never considered actual inventories in his report, which simply endorsed petitioner's objectively discredited methodology.  He, like Kirkland, was given the assignment of validating what was claimed on the return, not objectively determining costs of goods sold.  His original report exhibited overzealous advocacy and went far beyond admissible expert testimony when he argued that the IRS had not conducted a proper audit and that there were no badges of fraud.  He included the Goodrich line of business in his original analysis although respondent had not questioned the profits on that line.  When pushed to refine his statistical analysis in a supplemental report and during his testimony, he omitted major "large ticket" items, acknowledged data entry errors, and ended up with a small (15% of sales) and unreliable sample.  He purported to match purchases and sales of specific items but omitted some that were inconsistent with petitioner's tax reporting.  He did not match bulk purchases although they were a primary part of petitioner's business success.  He did not include any purchases made before January 1, 2004.  He adjusted his assumptions about obsolescence

**[*37]** without any rational objective evidence and apparently to justify his initial conclusions.

Michael Thompson's rebuttal report consisted of restating his own auditing approach to endorsing petitioner's reported costs of goods sold. He testified that he did not ask petitioner's officers about their inventory. He ignored the evidence of actual items in the inventory and Foote's claims about the cost and value of the nonobsolete inventory. He suggested that those highly paid officers whose success depended on familiarity with items purchased and resold did not understand and could not provide useful information for his analysis. He assumed obsolescence without discussion with petitioner's officers and contrary to evidence that obsolescence was not a factor in the Goodrich line of business and that most surplus items sold during 2004-08, the years of his analysis, were likely from inventory written off by being deducted in earlier years. For the foregoing reasons we reject Michael Thompson's opinion as unreliable and not credible.

Petitioner asserts that the Court's holding that the statute of limitations bars assessments for years before 2006 also undermines the stipulated "maximum" ending inventory value of $27,674,497 in 2008. That assertion is incorrect. Assessment and collection of the deficiencies and penalties are barred for the earlier years. See sec. 6501(a), (c). However, the correct liabilities from barred

[*38] years may be considered when necessary to determine the correct liabilities

for open years.  See Lewis v. Reynolds, 284 U.S. 281 (1932) (ruling that the

correct liability for a barred year may be determined in relation to a claimed

refund); Phoenix Coal Co. v. Commissioner, 231 F.2d 420, 421-422 (2d Cir. 1956)

(determining that the availability of a net operating loss carryover depends on the

correct liability for a barred year), aff'g T.C. Memo. 1955-28; Bachner v.

Commissioner, 109 T.C. 125, 130-132 (1997) (holding that an overpayment

claimed for a barred year may be reduced to reflect the correct liability), aff'd, 172

F.3d 859 (3d Cir. 1998); Lone Manor Farms, Inc. v. Commissioner, 61 T.C. 436,

440 (1974) (construing section 6214(b) as granting this Court the authority for

"computing, as distinguished from 'determining,' the correct tax liability for a year

not in issue when such a computation is necessary to a determination of the correct

tax liability for a year that has been placed in issue"), aff'd without published

opinion, 510 F.2d 970 (3d Cir. 1975); ABKCO Indus., Inc. v. Commissioner, 56

T.C. 1083, 1089 (1971) (concluding that a net operating loss for a barred period

may be recomputed to determine the proper net operating loss carryback deduction

for an open year), aff'd, 482 F.2d 150 (3d Cir. 1973); Gus Blass Co. v.

Commissioner, 18 T.C. 261, 266 (1952) (holding that the Commissioner is not

prevented from making adjustments to the taxpayer's inventories for closed tax

[*39] years in order to correct errors and thereby compute the appropriate tax liability applicable for open tax years before the Court), aff'd, 204 F.2d 327 (8th Cir. 1953); Magma Corp. v. Commissioner, 81-2 U.S. Tax Cas. (CCH) para. 9634 (W.D. Ark. 1981) (resolving that the basis reported for a barred year may be redetermined in relation to a sale made in an open year).

The conclusions as to beginning and ending inventories were derived as a result of adjustments to costs of good sold for each year, including the open years 2006, 2007, and 2008. Those adjustments were based on Foote's admissions. The unreliability of petitioner's claimed deductions for costs of goods sold was shown by the evidence that establishes that the inventory balances petitioner reported on its returns and financial statements were grossly understated, so that the reporting and methodology petitioner adopted did not accurately reflect income. Petitioner has not proven any other amount between the $100 million inventory of nonobsolete items it claimed for 2007 and the substantially lower amounts determined by respondent. Respondent's determination results in a more reasonable conclusion as to the value of beginning and ending inventories for 2006, 2007, and 2008 and will be sustained.

**[*40]** <u>Accuracy-Related Penalty</u>

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax which is attributable to a substantial understatement of income tax. In the case of a corporation (other than an S corporation or a personal holding company), an understatement of income tax is substantial if it exceeds the lesser of 10% of the tax required to be shown on the return (or, if greater, $10,000) or $10 million. Sec. 6662(d)(1)(B). The understatements of income tax for 2006, 2007, and 2008 are substantial.

We explained in <u>Transupport I</u> why we rejected petitioner's reliance on its accountant defense in relation to the fraud penalty. Petitioner cannot sustain a claim of good-faith reliance on the accountant sufficient to avoid the section 6662(a) penalty. The continued trial produced no new evidence on this issue, and petitioner's posttrial briefs blindly pursue its unpersuasive arguments. Petitioner's accountant was given numbers to fill into financial statements and tax forms and was not provided with accurate information concerning actual inventories at the end of each tax year. Petitioner presented no evidence that its accountant or anyone else ever advised it that the amounts paid to the Foote sons were deductible as reasonable compensation. See <u>Brinks Gilson & Leone A Prof'l Corp. v. Commissioner</u>, T.C. Memo. 2016-20, at *30-*33. Petitioner's officers

**[*41]** knew that actual inventories exceeded the amounts used in computing reported costs of goods sold. See id. at *33-*35. Foote's admissions during the course of attempting to sell petitioner are compelling evidence that Foote knew that the tax reporting was incorrect and intended it to be so. Petitioner avoided the fraud penalty and an open period of limitations for tax years 1999-2005 only because neither its accountant nor the IRS auditors clearly warned petitioner's officers that its methodology was unacceptable. That is a far cry, however, from saying that the methodology had a reasonable basis or was adopted in good faith. Petitioner did not rely on its accountant and did not have a good-faith belief that its liabilities were correct.

Petitioner again argues that the methodology was used consistently over years and was therefore correct. Petitioner apparently believes that repeating a fallacy over and over again and ignoring contrary evidence will succeed. It does not. A well-established principle is that what was condoned or agreed to for a previous year may be challenged for a subsequent year. Auto. Club of Mich. v. Commissioner, 353 U.S. 180 (1957); Rose v. Commissioner, 55 T.C. 28 (1970). Thus, the results of a prior audit do not constitute substantial authority. Petitioner's methodology was consistently wrong over the years and was notably wrong for 2006, 2007, and 2008. The section 6662(a) penalties are sustained.

**[\*42]**   We have considered the additional arguments of the parties.  They are irrelevant, moot, or without merit.  We are uncertain why respondent's brief states that a Rule 155 computation is necessary.  However, to reflect our conclusion in Transupport I that petitioner prevails for 1999 through 2005, and with respect to the fraud penalty for all years, and our above conclusion that respondent otherwise prevails for 2006 through 2008, the parties should submit their proposed decision, and

Decision will be entered

under Rule 155.
